THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES WATKINS, JR., Defendant-Appellant.

(No. 58586;

First District (4th Division)—February 6, 1974.

Paul Bradley, Deputy Defender, of Chicago (Steven Clark, Assistant Appellate Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Michael J. Polelle, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

The defendant-appellant was indicted for murder and after a trial by jury was found guilty of voluntary manslaughter. In this appeal the defendant maintains that the State failed to prove him guilty beyond a reasonable doubt; that he was improperly limited to ten peremptory challenges in a murder trial; and that the sentence imposed was excessive in light of his background and under the Unified Code of Corrections. While we agree with the defendant that the minimum term of his sentence must be reduced in accordance with the provisions of the Unified Code of Corrections, we find no merit in the other issues raised.

There was no dispute at the trial that Albert Smith was killed by the defendant on January 7, 1972. It was the State's position that the defendant murdered Smith, but the defendant contended he acted in self-defense. The event which precipitated the death of Mr. Smith was an argument that occurred between Smith and the defendant on the evening of January 7, 1972, in the apartment of Janice Cannon. The evidence adduced at trial established that Albert Smith, the defendant, Son Harris, Maurice Cannon and Steven Cannon were drinking wine in the dining room of Janice Cannon's apartment. Janice Cannon and her boyfriend, Frederick Hamilton, were also in the apartment on the

evening in question. The argument between Smith and the defendant commenced when the defendant picked up an extension phone while Smith was using the phone line. After Smith and the defendant exchanged words, the defendant was asked by Frederick Hamilton to leave the apartment and the defendant left.

Janice Cannon testified for the State and said that after Frederick Hamilton requested the defendant leave, he accompanied the defendant out of the apartment and she heard a conversation between the two men. She stated that the defendant said, "I'm going to kill somebody tonight; I'm going to give that nigger six inches." At this time Albert Smith was still inside Janice Cannon's apartment and she stated he remained there for approximately twenty-five minutes. Miss Cannon testified that after Frederick Hamilton returned inside the apartment she peeked through a crack in the front door of the apartment and saw a dark handled, silver blade knife, a butcher knife, in the defendant's possession. Albert Smith approached the front of the apartment and Miss Cannon stated she asked him not to leave because she was afraid for him. However, Smith decided to leave and Miss Cannon testified that he began to take his coat off and that she asked him, "Why are you taking your coat off?", and he replied, "I don't need it, because its a lot of weight to me." Miss Cannon also told Smith that the defendant had a knife and suggested he go out the back door but Smith refused. Miss Cannon testified that she observed the defendant ascending the stairs in the hallway of the apartment building and that the defendant said to Albert Smith, "You want me, ———" and added an obscenity to this phrase. It was the testimony of Miss Cannon that the defendant then approached Smith with the knife and the defendant stabbed at Smith but missed. Miss Cannon did not observe any weapons in the possession of Smith. The defendant dropped the knife according to Miss Cannon and then began to reach for it. At this time Smith attempted to get past the defendant and Miss Cannon testified that the next thing she saw was the knife go up and come down, and then blood began to spurt out of Albert Smith's chest. Miss Cannon testified that the next time she saw the knife was when Miss Nellie Edwards brought it into the Cannon apartment and that the blood had been wiped off.

Frederick Hamilton testified on behalf of the State and said that after he requested that the defendant leave he and the defendant sat on some steps located in the hallway. Hamilton stated that the defendant said he was going to give Smith six inches of his blade. The defendant did not show Hamilton a knife but as he spoke the defendant grabbed his side. When Hamilton returned inside the apartment, he testified he heard Albert Smith say, "He wasn't going to let no young punk, * * *, stop

him from going out the way he came in." Hamilton testified further that when Smith walked out of the Cannon apartment he was in the front room and that he heard a big argument out in the hallway. However, Hamilton did not leave the front room and had no knowledge of the events that took place in the hallway after Smith left the apartment.

Maurice Cannon also testified for the State and he corroborated the testimony of the other witnesses as to the argument between Smith and the defendant. He also testified that he heard the defendant tell Smith to come outside the apartment and he would give him six inches. Maurice Cannon offered to walk Smith home and as they proceeded out the front entrance of the apartment Maurice returned inside to get a pack of cigarettes. While inside Maurice heard his sister, Janice Cannon, scream and he ran out of the apartment to see what was occurring. Maurice Cannon testified that as he was standing on the top landing he observed the defendant run up the steps followed by Smith. It was Maurice's testimony that the defendant fell backwards and as he fell the defendant reached into his coat and pulled out a knife. Maurice stated that Smith ran down the steps and the defendant chased him with the knife. At this time Maurice observed that Smith had a hole in the back of his shirt. Maurice further testified that he tried to grab the defendant from behind but before he was able to get down the steps the two men were in a corner of the vestibule and Smith was in a bent forward position. Maurice stated that the defendant raised the knife to stab Smith again but that Son Harris knocked the knife out of his hand. Maurice testified that at this time Smith fell to the floor and that he had two stab wounds. One was in the left breast and the other was in the left arm. The defendant tried to leave and Maurice grabbed him by his throat. Maurice stated the defendant pulled out of his coat, got past him and left the building.

The State's other witness did not have any first hand knowledge of the incident. Barbara Jean Smith, the victim's wife, testified as to her identification of her husband's body following the incident. Edwin McNulty, a Chicago policeman assigned to the criminalistics division, identified certain photographs that he took of the scene and stated that he recovered a knife which was found near a radiator in the first floor hallway. Officer McNulty testified that no fingerprints were found on the knife and that it was the only weapon recovered from the scene. Dr. Jerry Kearns, a pathologist for the Coroner of Cook County, testified and stated that Albert Smith had three stab wounds. There was a wound in the chest which was fatal and superficial wounds in the left forearm and left back. Dr. Kearns was of the opinion that the first wound inflicted was in the forearm and the second wound was in the heart with the

superficial wound in the back being the last received. He also stated that Smith would not have had much energy to do anything else but collapse after the chest wound.

Robert Minster, a Chicago policeman, testified that he investigated the homicide in question and that when he arrived upon the scene he observed a male Negro in the vestibule who had stab wounds in the chest and forearm. Officer Minster attempted to locate the defendant but was unsuccessful. Officer Minster also testified that he observed a knife near a radiator in the hallway and that it had blood on it. Investigator William Frost also testified and stated that a police report would routinely be made of the knife but he did not have it.

The defendant testified in his behalf and stated that after he and Albert Smith had the argument he left the apartment with Frederick Hamilton. The defendant testified that he and Hamilton sat on some steps in the hallway and talked and then Hamilton returned inside the apartment. At this time Steven Cannon came out and he and the defendant went to a store to buy some more wine. The defendant stated that they were gone approximately fifteen minutes and that when they returned he refused to go upstairs. Mary Linda Brown entered the building and she and the defendant started a conversation. The defendant's girlfriend, Rachel, lived in an apartment across the hall from Janice Cannon and Rachel's little sister called to the defendant that Rachel wanted to see him. The defendant stated that he proceeded up the stairs and at this time Albert Smith, Janice Cannon and some other people came out of Janice Cannon's apartment.

As the defendant encountered Smith, according to the defendant, Smith said to the defendant, "Shoot me." The defendant stated that Smith kicked him in the mouth and he grabbed Smith's leg and they both tumbled backwards down the stairs. When they hit the landing, the knife fell and both men began wrestling and tried to get to the knife. The defendant testified that Smith grabbed the knife and began cutting the defendant's hand. The defendant pushed Smith to the side and at this time Maurice Cannon grabbed the defendant from behind. The defendant stated that he was able to free himself from Maurice Cannon's grasp and as he did so Smith ran into him and they began to tussle. The knife fell again and the defendant tried to grab it. The defendant testified that he was able to gain possession of the knife and as he did Maurice Cannon grabbed him again. The defendant stated that when Smith saw Maurice holding him, Smith ran into the defendant and grabbed him. The defendant stated that it was at this time that he stabbed Smith. According to the defendant, Maurice Cannon then grabbed him around the throat. The defendant pushed Maurice away

and then the defendant's mother entered the bulding. The defendant testified that his mother fainted and that he picked her up and carried her home. The defendant returned but left when warned that the police would shoot him when they got there. The next day the defendant surrendered to the police. The defendant denied having a knife in his possession on the evening in question.

Upon cross-examination the defendant denied that he said he was going to give Albert Smith six inches. The defendant explained that when he was speaking with Frederick Hamilton the subject came up about Smith doing something to the defendant with a knife and the defendant told Hamilton if anything he would make Smith eat that six inches of knife. The defendant admitted stabbing Smith but maintained he did so only to defend himself.

The State called the records custodian of Cook County Jail as a rebuttal witness. He referred to an admissions report used in the jail when the defendant was admitted on January 9, 1972, and stated that the defendant had no cuts or bruises on that date. The defendant testified in surrebuttal that he had visible scars when admitted to jail but that no examination for them was made. At the conclusion of all the evidence the jury found the defendant guilty of voluntary manslaughter.

■■ The first issue raised by the defendant is that the State failed to prove him guilty beyond a reasonable doubt. This contention is premised on the assertion that the defendant acted in self-defense. After a reiteration of the testimony of the State's witnesses, the defendant maintains that it, together with his own testimony, established that Albert Smith was the aggressor and the defendant acted in his own defense. However, we are reminded of this very court's statement in *People v. French,* 3 Ill.App.3d 884, at 886 to 887, 279 N.E.2d 519, at 522 (1972):

> "The issue of self-defense is ordinarily a question of fact which must be resolved by the trier of fact. (*People v. Hurst,* 42 Ill.2d 217, 247 N.E.2d 614, *People v. Davis,* 35 Ill.2d 55, 219 N.E.2d 468), and a court of review will not disturb the verdict of a jury or the finding of a court unless the evidence is palpably contrary to the verdict or finding or so unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *People v. Jordan,* 18 Ill.2d 489, 165 N.E.2d 296, *People v. Wesley,* 18 Ill.2d 138, 163 N.E.2d 500."

We also stated in the *French* case that: "The trier of fact need not necessarily accept, as true, testimony concerning self-defense presented by the accused; but in weighing such evidence it must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of witnesses other than the ac-

cused, (*People v. Warren*, 33 Ill.2d 168, 210 N.E.2d 507, *People v. Uher*, 375 Ill. 499, 31 N.E.2d 936.)" (*People v. French*, 3 Ill.App.3d 884, at 887, at 522.) The record in this case was lengthy but after a perusal of it in its entirety we cannot say that the jury's verdict was palpably contrary to the evidence or so unsatisfactory as to raise a reasonable doubt of defendant's guilt.

■■■ The defendant specifically points to certain inconsistencies and contradictions in the testimony of the prosecution's witnesses and alleges it must have left the jury confused as to what took place. However, as our Supreme Court stated in *People v. Davis*, 35 Ill.2d 55, at 61, 219 N.E.2d 468, at 471 (1966), "Where * * * the evidence is conflicting, it is for the jury to decide under proper instructions whether a homicide was murder or manslaughter, or whether it was justified as self-defense." The defendant also elaborated upon the fact that Albert Smith refused to avoid a confrontation but it is well established under our law that no such duty exists. In *People v. Bush*, 414 Ill. 441, at 444, 111 N.E.2d 326, at 328 (1953), our Supreme Court stated:

> "We have repeatedly held that one who is unlawfully assaulted and put in apparent danger of his life or of great bodily harm need not attempt to escape but may repel force with force, even to the taking of assailant's life, if necessary or apparently so, to prevent bodily harm. *Hammond v. People*, 199 Ill. 173."

The defendant correctly stated that the State must overcome his defense of self-defense and prove him guilty beyond a reasonable doubt on this issue as well as the other elements of the offense. However, the record reflects that the prosecution did meet its burden of proof and the verdict of the jury is not palpably contrary to the evidence.

The second issue raised by the defendant is that he was improperly limited to ten peremptory challenges in a murder trial. The defendant's trial commenced on July 13, 1972, and prior to the voir dire examination the trial court ruled that the defendant would only be allowed ten peremptory challenges. In making its ruling the trial court specifically referred to the United States Supreme Court decisions of *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726 (1972) and *Moore v. Illinois*, 408 U.S. 786, 33 L.Ed.2d 706, 92 S.Ct. 2562 (1972) which struck down the death penalty as cruel and unusual punishment. The trial court stated, "In lieu of the decision, Thurman [*sic*] versus Georgia and Moore versus the State of Illinois, in which the statute, pertaining to the death penalty, has been specifically declared to be unconstitutional, therefore, there is no further possibility, at the present time, of any death penalty. Therefore, the Court rules that there are only ten pre-emptory [*sic*] challenges." The defendant maintains that this ruling

was in error due to section 115-4(e) of the Illinois Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e)). This section provides that a defendant is entitled to 20 peremptory challenges in a capital case, 10 in a case where the punishment may be imprisonment in a penitentiary and 5 in all other cases. The defendant maintains that since he was indicted for murder and the death penalty could have been imposed but for the *Furman* and *Moore* decisions, he was denied his statutory right of 20 peremptory challenges. We do not agree.

■■ The controversy on this issue stems from the fact that the defendant was tried subsequent to the decisions in *Furman* and *Moore* and in light of them the trial court could no longer impose the death penalty but the statute providing for 20 peremptory challenges in a capital case was still effective. At the time of defendant's trial the relevant and closest statement of a definition of a capital offense was contained in section 1—7(c)(1) of the Illinois Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 1—7(c)(1), repealed, effective January 1, 1973). This section stated, "Where, upon a trial by jury, a person is convicted of an offense which might be punishable by death, the jury may return a verdict of death. Where such verdict is returned by the jury, the court may sentence the offender to death or to imprisonment. Where such verdict is not returned by the jury, the court shall sentence the offender to imprisonment." Although this section was subsequently repealed its terms are essentially contained in section 5—5—3(b) of the Unified Code of Corrections. At the time of defendant's trial the trial court was precluded by the *Furman* and *Moore* decisions from imposing the death penalty and therefore the only sentence that could be imposed was imprisonment in the penitentiary. The defendant's case therefore falls within the provision of section 115—4(e) which only allows 10 peremptory challenges where the punishment may be imprisonment in the penitentiary.

The defendant maintains that a definition of capital offenses should include those offenses that could be punished by death but for the United States Supreme Court decisions. However, the decisions of *Furman* and *Moore* cannot be ignored and as a result of them there are no longer capital offenses as such. The defendant also contends that the legislature must have intended that a distinction be drawn between a serious offense such as murder and other relatively minor felonies in which imprisonment in the penitentiary could be the punishment. However, no such distinction existed under section 115—4(e) prior to the *Furman* and *Moore* decisions. For example, a defendant in a burglary case faced a possible life imprisonment sentence and a defendant in a kidnapping case could be sentenced only for a term in the penitentiary

from one to five years but yet each was only entitled to ten peremptory challenges. (Ill. Rev. Stat. 1971, ch. 38, par. 19—1(b), par. 10—1(c).) The trial court's ruling in the case at bar was not erroneous since the only punishment that could be imposed was imprisonment in the penitentiary. The defendant was, therefore, only entitled to ten peremptory challenges. It is not the function of this court to legislate and any change in the number of permissible peremptory challenges must necessarily stem from action of our General Assembly and not this court.

■■■ The defendant's final contention is that the sentence imposed was excessive in light of his background and under the Unified Code of Corrections. The defendant was sentenced to a term of from 7 to 20 years and while an appellate court has the authority under Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(4)) to reduce the punishment imposed by the trial court, the standard governing the exercise of this power is stated in *People v. Richardson*, 43 Ill.2d 318, at 321-322, 253 N.E.2d 420 at 423 (1969):

> "This court has consistently held that 'Where it is contended that the punishment imposed in a particular case is excessive, though within the limits prescribed by the legislature, this court should not disturb the sentence unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose, or that the penalty is manifestly in excess of the proscription of section 11 of article II of the Illinois Constitution which requires that all penalties shall be proportioned to the nature of the offense.' (*People v. Smith*, 14 Ill.2d 95, 97; *People v. Taylor*, 33 Ill.2d 417, 424.) And, although by our rules reviewing courts have authority to reduce sentences imposed by trial courts, '* * * such authority should be applied with considerable caution and circumspection, for the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination concerning the punishment to be imposed than do the appellate tribunals.' (33 Ill.2d at 424.)"

It has also been established that the defendant has the burden of producing evidence that will show the severity of the sentence necessitating a reduction. (*People v. Ledferd*, 94 Ill.App.2d 74, 236 N.E.2d 19 (1968).) There was a full and complete hearing in aggravation and mitigation in this case and the record does not disclose nor has the defendant produced evidence of anything which would necessitate a reduction of the sentence. The trial court was in a better position to determine the proper sentence and the sentence imposed was not manifestly excessive. The

defendant points to a past record of relatively minor offenses as evidence that his sentence was excessive. However, the defendant committed a grave offense here and the sentence imposed is not disproportionate to the seriousness of the offense, nor does it fail to recognize the possibility of rehabilitation. While we do not agree that the defendant's maximum sentence should be reduced, the minimum must be reduced to comply with the provisions of the Unified Code of Corrections. (Ill. Rev. Stat., ch. 38, par. 1005—8—1(c)(3).) The defendant was convicted of a class 2 felony and the greatest maximum term was imposed, 20 years. The minimum term cannot be greater than one-third the maximum and therefore the defendant's sentence of 7 to 20 years is reduced to 6 years and 8 months to 20 years. With the exception of reducing the defendant's minimum sentence, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN and JOHNSON, JJ., concur.