THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BRENDA GREEN, Defendant-Appellant.

(No. 59481;

First District (1st Division)—July 7, 1975.

SIMON, J., specially concurring.

James J. Doherty, Public Defender, of Chicago (Phillip A. Olson and Matthew J. Beemsterboer, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Ricky L. Petrone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant, Brenda Green, and Melvin Loveless were indicted for murder and conspiracy to murder her husband, Lawrence Green. Loveless entered a plea of guilty and the defendant was found guilty by a jury; she was sentenced to a term of 25 to 35 years.

The defendant and the deceased were married in March, 1972, and lived at 3653 South King Drive in Chicago. In the early morning of August 29, 1972, the deceased's body was found by the police lying face down in a street in Wilmette with a black plastic bag over his head. His death was due to a severe injury to the skull and brain which, in the opinion of the pathologist, was caused by a "broad, blunt, heavy object compatible with a two-by-four." On September 8, the defendant gave statements to the police and State's Attorney in which she said that she had talked to Melvin Loveless about killing her husband, with whom she had had difficulty, and that she let Loveless in her apartment on the night of August 28, knowing he was going to kill her husband. Later she assisted Loveless in removing her husband's body from her apartment and disposing of it in Wilmette.

The defendant first contends that her motion for discharge under the Four Term Act was improperly denied. (Ill. Rev. Stat. 1971, ch. 38, par. 103—5.) The defendant was arrested on September 8, 1972, and remained in custody until her trial began on April 26, 1973. She was arraigned on November 14, 1972, and the case was assigned to Judge Strayhorn. On the same day, with 52 days remaining in the term, the defendant filed a motion for discovery before Judge Strayhorn, who, in reliance on the appellate court opinion in *People v. Nunnery*, 4 Ill.App.3d 217, 280 N.E.2d 537, over objection of the defense attorney, continued the case on motion of the defendant to December 15, 1972, without subpoenas to set the case for trial.

On December 15, 1972, the following occurred before Judge Strayhorn:

> "Mr. Lincoln [Public Defender]: With reference to Mrs. Green I was under the impression this was set for Monday, has this been motioned up for today?
>
> The Court: No, it is regularly on this call for today for filing of discovery.
>
> Mr. Lincoln: Well, as long as it is here I will file a motion to suppress which I was planning on filing Monday.
>
>       ❊      ❊      ❊
>
> Mr. Lincoln: I would like to file the motion to suppress physical evidence and motion to quash arrest and suppress evidence.
>
>       ❊      ❊      ❊

The Court: State ordered to file its response to defendant Loveless' request for discovery within fifteen days from today. Mr. McNeil, you will have on behalf of Mr. Loveless fifteen days thereafter to file your response to the State's request for discovery. Motion of defendant Green to suppress physical evidence—what physical evidence are you seeking to suppress, Mr. Lincoln?

Mr. Lincoln: I believe there were some papers in a wastebasket and there were some other items but I am not sure exactly what.

The Court: Before we hear this motion you will file an amended motion setting forth the specific items you seek to suppress and to quash the arrest from and we will hear your motion on January 19. It will be motion of the defendant.

Mr. Lincoln: We are ready for a hearing on our motion.

The Court: You can't be ready for a hearing, Mr. Lincoln. You have just told me you thought this matter was up Monday; it will be motion of the defendant Green for January 19.

Mr. Lincoln: I indicated I thought it was up Monday, yes, so far as the motion.

The Court: It's motion defendant, Mr. Lincoln, January 19.

Mr. Lincoln: Can I say what I have to for the record?

The Court: No, I don't want to hear anything else in that connection. You are not going to clutter up the record. You just stood up here and said you thought it was up Monday and now you file a motion and you say you are ready for a hearing on it. Motion of the defendant, January 19.

Mr. Lincoln: On this motion I have no other evidence that I need to gather other than the defendant.

The Court: Well, it's motion of the defendant Green, January 19.

Mr. Lincoln: We will object to it being motion of the defendant.

The Court: Your objection is overruled."

It is the position of the State that the discovery motion of November 14 and the motion to suppress of December 15 each tolled the statute. The State concedes if neither motion did toll the statute the defendant must be discharged.

The impact of discovery motions on the statutory period has been expressed in *People v. Nunnery*, 54 Ill.2d 372, 374, 297 N.E.2d 129, which reversed the appellate court opinion relied on by the trial judge in this case. In *Nunnery*, the defendant was arraigned 115 days after his arrest and filed a discovery motion. The State contested some aspects of the motion, and the court reserved its ruling on the request for information

concerning whether, when, by whom, and under what circumstances the defendant had been identified. The State's Attorney requested time to learn by whom the defendant had been identified because he might have had an objection to disclosing that information to the defendant. At the same time the State's Attorney mistakenly informed the judge that the statutory period would not run for 6 weeks. The supreme court upheld the trial court's order discharging the defendant (54 Ill.2d 372, 376-377):

> "The record contains no explanation of why defendant's arraignment and the appointment of counsel were delayed until he had been incarcerated for 115 days. Clearly he was entitled to discovery [citation], and if, as is now contended, the People were ready for trial within the 120-day period, the information which the court ordered the People to produce could have been given defendant promptly and the court advised immediately as to the People's position with respect to the paragraphs of the motion on which the ruling was reserved. Furthermore, it was the State's Attorney who erroneously advised the court that the statutory period would not run for 6 more weeks, and nothing in the record indicates that defense counsel, appointed that day, knew when the defendant was arrested and how long he had been in custody. Upon consideration of all of the circumstances we conclude that the delay was not occasioned by the defendant and the circuit court did not err in discharging him."

In *People v. Scott*, 13 Ill.App.3d 620, 301 N.E.2d 118, the appellate court noted that *Nunnery* was decided on the precise facts before it and was authority for the proposition that not every discovery motion causes a delay which can be attributed to the defendant. The court stated what we deem to be the sound rule governing the applicability of discovery motions to the statute and the rule's rationale (13 Ill.App.3d 620, 630):

> "Motions for discovery may or may not require time to comply with them. A motion may be simple and easily answered or it may be detailed and difficult to answer. The information requested may be presently known or it may only be obtained after search and inquiry. The requested information may be reasonable and supplied without objection or it may call forth objections which must be heard and resolved. A discovery motion which the State can answer quickly would cause little or no delay; the State should not be permitted to use such a motion as an excuse to toll the statute implementing the constitutional right to a speedy trial. On the other hand, a discovery motion that calls for answers which are not quickly available or requests answers replete in detail would cause a legitimate delay; such a motion is properly attrib-

utable to a defendant and tolls the running of the statutory period. Whether a motion falls into the former or the latter category would depend on the facts of each case. This calls for the trial court's appraisal of the motion, its need, timeliness and complexity; it calls for the court's appraisal of the State's ability to answer the motion immediately or the merit of the State's reasons for not doing so. The interpretation of the motion and of the availability of the required information, the reasonable time needed to answer and whether proposed objections are genuine or dilatory, should rest in the judgment of the trial court and its decision as to the accountability for the ensuing delay, if there is one, should be sustained unless it is clearly shown that the court's discretion was abused."

All the continuances are either on motion of the State, order of court, by agreement or motion of the defendant. Only if the continuance is by agreement or on motion of the defendant may the delay be chargeable to the defendant. When the discovery motion is made and the judge orders compliance and continues the matter to give the State time to comply, he must make a judgment based on what is before him at that time as to the accountability for the delay.

■■ In this case, the public defender filed a motion for discovery when the defendant first appeared before Judge Strayhorn. Although it is a form motion, it is very comprehensive. It sought a bill of particulars containing the exact time and date of the occurrence and the exact street address and physical description of the location of the occurrence; the names and addresses of any witnesses the State might or might not call and the production of any written or recorded statements by those witnesses or any memoranda reporting or summarizing oral statements of the witnesses; any written or recorded statements or the substance of any oral statements made by the accused or codefendant and a list of witnesses to the making and acknowledgement of the statements, the time, place and date of the statements and any written or recorded memoranda containing the substance of any oral statements; any transcript of the grand jury minutes containing the testimony of the accused and testimony of those witnesses who might be called to testify before trial including any transcription made of a witness' testimony that might be favorable to the defense; a list of all physical property that the State intended to use at the time of trial including a list of all physical property in the possession of law enforcement officials, the date and time the property was acquired, the location from which the property was acquired, what person or persons first took the property into their possession, reports made by law enforcement authorities pertaining to the property includ-

ing scientific reports; any reports of experts made in connection with the particular case including the results of physical or mental examinations and of scientific tests; any books, papers, documents, photographs or tangible objects which the prosecution intended to use in the hearing or which were obtained from or belonged to the accused or codefendant; prior criminal records of the State's witnesses to be used for impeachment; whether the prosecution intended to use certified copies of convictions of the accused for purposes of impeachment and time and jurisdiction of such convictions; any evidence in the prosecution's possession as to whether it would rely on prior acts or convictions of a similar nature for proof of knowledge, intent or motive; the names and addresses of the witnesses the State intended to call for identification of the defendant including time, date and place of identification confrontation; if photographic identification was used, production of any photo used whether of the defendant or of other persons; all persons present at such viewing; any pictures taken of the line-up; the names of any individuals who confronted the accused and made no identification or identified him for other crimes; notification of any electronic surveillance (including wiretapping) of conversations to which the accused was a party or his premises, or that the prosecution intended to use in the prosecution of a conspiracy; any evidence that was acquired as a result of the execution of any legal process and, if so, a copy of the legal process for purposes of inspection; and the names and addresses of any witness or witnesses that might be or would be favorable to the defendant, who were to be clearly and separately identified on the list of witnesses as was any physical evidence or scientific evidence that might or would be favorable to the defense. The motion asked that the prosecution be ordered to compel any informant whose identity they intended to keep secret to be brought to the court at any time, date, or place out of the presence of the defendant and defense counsel to assert whether or not the informant in fact did exist and the informants who were to be produced at any hearing or trial to be named and disclosed on the list of witnesses; and for an order that the State make available relevant witnesses for the purpose of preserving testimony that might be made unavailable, to include production of certain books, papers, documents or tangible objects that might be under the control and possession of those witnesses.

It is apparent that compliance with such a motion *might* require considerable time, but it is also apparent that it *does* require considerable investigation to determine whether the things sought actually exist. Assisted by hindsight, we see that the State filed a list of witnesses on January 19, which included a doctor from Evanston Hospital, two mem-

bers of the Wilmette Fire Department, two employees of the coroner's office, including a physician; two members of the Chicago Crime Detection Laboratory, a resident of Boston, Massachusetts, an assistant State's Attorney, a court reporter; members of the Wilmette and Chicago Police Departments; and relatives and neighbors of the deceased. We also see that the case involved photographs, bloodstained papers, a two-by-four and written statements; and to a large degree scientific evidence such as blood types, the plastic bags and the nature of the wounds. Some of the difficulty in preparation that confronted the State may be illustrated by the fact that it was required to prove the deceased's blood type from his army records; and we note, parenthetically, that on December 15, the State had not yet complied with the discovery order and that the defense made no point of it. We believe, therefore, that this was a relatively complex case and that compliance with the discovery motion filed by the defendant caused a delay which should be attributed to her. Although the trial judge based his decision on a case which was later reversed, subsequent events proved that he did not abuse his discretion and that regardless of his reason he should have continued the cause on motion of the defendant.

By these observations we do not mean to suggest that what transpires later should be the yardstick by which the judge's discretion is measured. The judge is not a seer who can look into the future and tell how long a discovery motion requires for compliance. The decision to make a continuance attributable to the State, defendant or court must be made at the time the motion is made and it must be based on what is then before the court. In many cases, as in this one, neither the judge nor the assistant State's Attorney has any knowledge of the facts of the case at the time the discovery motion is made. It is the duty of a reviewing court to place itself in the position of the trial judge at the time of the ruling to see if there is some valid reason for it (*People v. Garrett*, 115 Ill.App.2d 333, 341, 253 N.E.2d 39); and it would be unfair for a reviewing court, speaking from its "cool and distant station" and having the benefit of hindsight, to gainsay the trial court's decision because subsequent proof shows that the discovery motion was, in the opinion of the reviewing court, easily answered by the State.

■■ We also believe that the defendant's motion for discharge was properly denied because the motion to suppress the evidence filed December 15 also tolled the statute. The case of *People v. Schoeneck*, 1 Ill. App.3d 395, 401, 274 N.E.2d 483, is clearly in point, as are the cases cited by the State, *People v. Ross*, 132 Ill.App.2d 1095, 271 N.E.2d 100, and *People v. Jones*, 130 Ill.App.2d 769, 266 N.E.2d 411. For these reasons

we judge that the trial court properly denied the motion for discharge.

Over the defendant's objection, the court gave the following instruction:

> "You have before you evidence that a defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and if so, what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made."

The defendant contends that this instruction was prejudicial error since none of the statements admitted in evidence was a confession. In her handwritten statement to the Chicago police, the defendant said that she had talked to Loveless about having trouble with her husband. As time went on, she continued to have trouble "so Melvin [Loveless] told [her] that he was sick of Lawrence treating [her] this way, so he said that he would kill him." Monday night he came to her apartment, rang her front doorbell and came in and hit her husband with a stick six times. He wrapped her husband's body in a spread and took the body out the back door. Later, in a statement given to an assistant State's Attorney, she identified her handwritten statement and said that the facts as she wrote them were true and correct. Parts of the statement to the assistant State's Attorney are as follows:

> "Q. Would you like to tell me in your own words what happened that night?
>
> A. Yes. That Monday evening Melvin came by my house. My husband was on the couch asleep and he—
>
> Q. By Melvin, you mean Melvin Loveless?
>
> A. Right. He came in and I informed him that Lawrence was sleeping on the couch. He took the board from the back door and beat him with it.
>
>              *     *     *
>
> Q. What did Melvin do with the board then?
>
> A. He hit him with it six times, he told me, I went on the porch. I wasn't in the house when he did it but I heard him hit once but he told me he hit him six times.
>
> Q. Were you in or out of the room when he hit him?
>
> A. I was out on the porch.
>
>              *     *     *
>
> Q. Where was your husband at the time he was struck?
>
> A. Laying on the couch.
>
> Q. Was he asleep at this time?
>
> A. Yes, he was.

* * *

Q. Had you talked to Melvin that day prior to him coming up there to the apartment that Monday?

A. Yes, I had.

Q. Had you made any kind of arrangements with him to come up to the apartment?

A. He just said that he would come up there and he did.

Q. Why did he come up to your apartment?

A. To do exactly what he did.

Q. You mean to kill your husband?

A. Yes.

Q. You had discussed that before he came up to your apartment?

A. We talked about it, yes.

* * *

Q. And what happened afterwards? Do you remember going in and looking at Lawrence?

A. Yes, I did.

Q. Was he still on the couch?

A. Yes, he was.

Q. What did you notice about him at that time?

A. That he was dead.

Q. Did you see any of the blood?

A. Yes, I did.

* * *

Q. Had you talked with Melvin before that Monday about doing this to your husband?

A. Yes.

* * *

Q. When Melvin first came to the door that night which door did he come to, do you remember?

A. The front door.

Q. How did you know he was at the door?

A. He rang the bell twice.

Q. Weren't you afraid that might wake up your husband?

A. No.

Q. Why is that?

A. Because he was always a heavy sleeper, a sound sleeper.

Q. What did you say to Melvin when you saw him at the door that night, do you remember?

A. No.

Q. You were not in the room at the time he struck your husband, is that right?

A. Right

Q. Why was that?

A. I was just afraid to be there. I didn't want to be in there.

Q. Did you know what he was going to do?

A. Yes, I did.

Q. How did you know? Had you discussed it with him?

A. Yes, I had."

She then stated that she cleaned up the blood and Melvin wrapped the body up in the spread, dragged it outside and put it in the car. She and Melvin drove to Wilmette and placed the body in the street.

When questioned by the assistant State's Attorney further, the following occurred:

"Q. And you had discussed the matter of doing away with your husband more than once, is that right?

A. With Melvin?

Q. Yes, with Melvin.

A. Yes."

We do not agree that the statement given to the assistant State's Attorney was not a confession. The State proceeded against the defendant on the basis of accountability and the following language in *People v. Rollins*, 119 Ill.App.2d 116, 131-132, 255 N.E.2d 471, is most apt:

"Defendant argues that there was *no* confession—rather, what he told the police was a 'statement,' and that a statement is not an acknowledgement of guilt, whereas a confession is. This differentiation is correct. A confession is a comprehensive admission of guilt or of facts which necessarily and directly imply guilt. Defendant says that what he told the police was not a confession because he told the officer that he stood by while others entered the house and removed the television. But as we have seen from our discussion of accountability, one can stand off in the wings, as it were, and yet be held accountable for the action center stage. What he told the police was indeed a confession as we have just defined it. There is a reasonable inference from what he told the police officer that he committed the crime with which he was charged. That his answers were not couched in the terms of the statutes on accountability or burglary is hardly remarkable—it would have been remarkable if they had been. The facts he recounted to the police reasonably and directly implied guilt, hence the characterization was proper."

■■ In this case the statement shows that the defendant provided the motive for the killing and the opportunity for it with knowledge of what the killer intended to do. As in *Rollins*, the facts she recounted reasonably

and directly implied guilt and constituted a confession. The instruction, therefore, was proper.

Three rulings of the trial judge in the conduct of the *voir dire* examination of jurors are assigned as error: His refusal to permit any direct questioning of the jurors by the lawyers; his refusal to ask 9 of the 10 questions submitted by the defendant; and his denial of 20 peremptory challenges to the defendant.

■■ Supreme Court Rule 234 (Ill. Rev. Stat. 1971, ch. 110A, par. 234) provides:

> "The judge shall initiate the *voir dire* examination of jurors by identifying the parties and their respective counsel and briefly outlining the nature of the case. The judge shall then put to the jurors any questions which he thinks necessary, touching their qualifications to serve as jurors in the cause on trial. The parties or their attorneys shall be allowed a reasonable opportunity to supplement such examination, but shall not directly or indirectly examine jurors concerning matters of law or instructions."

We agree that Supreme Court Rule 234 does not permit a trial judge to prohibit all direct questioning of jurors by the parties. (*People v. Turner*, 27 Ill.App.3d 239; *People v. Carruthers*, 18 Ill.App.3d 255, 260-262, 309 N.E.2d 659.) But both *Turner* and *Carruthers* held that the mere denial of the right to question jurors directly was not per se prejudicial error; and *Turner* held that the burden was on the defendant to show that the prohibition against direct questioning prevented him from discovering any reason why a juror might be biased or unqualified or otherwise precluded the defense from an intelligent exercise of the right to challenge for cause or peremptorily. The rule provides for *supplemental* questions and was designed, in part, to put an end to time-consuming, repetitive questions. Needless to say, then, the court would have the right to block questions in areas that he had adequately covered even if put directly to the jurors. Since the only reasonable assumption is that the questions submitted by the defense attorney would have been the same questions that he would have asked himself directly, their propriety is dispositive of the defendant's argument.

The record shows that when the trial judge called for a conference in chambers after his preliminary statement to the jurors, he then had three questions which had been submitted to him by the defendant in writing. The first two asked if the jury could decide the case solely on the evidence presented; the third asked if the jurors believed policemen could lie under oath like other witnesses. The judge said that he had covered those areas; and he had. Then the defense attorney orally suggested other questions, one that inquired if the jurors could follow the

law if they thought the defendant had a "moral responsibility" for her husband's death; and another that asked if they could lay aside any sympathy for the deceased and his relatives. He also suggested this question:

> "The next question, during the trial, it may come out that the defendant engaged in misconduct, other than the crimes charged in the indictment. If you hear such evidence, would you be able to disregard such evidence, or would this evidence affect your judgment as to the ultimate question as to the guilt or innocence of the crime of murder and conspiracy to commit murder?"

Although her brief makes a general allegation that the court erred in refusing to ask these questions, she does not argue the point further and makes no attempt to show us the propriety of the questions. In our view the questions were either repetitive or clearly improper. For example, the evidence established that subsequent to the death of the deceased the defendant was guilty of obstructing justice (Ill. Rev. Stat. 1971, ch. 38, par. 31—4) and that fact could be considered as showing a consciousness of guilt. The last quoted question would, in effect, have erroneously told the jury that they had no right to consider such evidence.

We have examined the questions and answers in the examination of the jurors by the trial judge and his preliminary remarks. The jurors were provided a comprehensive explanation of the general law applicable and the duties of the court, jurors and lawyers. There is nothing in the record to show that the defendant's attorney was prevented from discovering any fact or reason why a juror might be biased or lacked qualification. We note that the only time the defense attorney asked in open court that the judge inquire further of a particular juror, the judge complied. We conclude, therefore, that the defendant has failed to show any prejudice from the conduct of the *voir dire* examination.

■■ The defendant's argument that she was improperly limited to ten peremptory challenges was also answered adversely to the defendant in *People v. Turner*, 27 Ill.App.3d 239. Turner followed *People v. Watkins*, 17 Ill.App.3d 574, 308 N.E.2d 180, where the court held that since the defendant was tried subsequent to the United States Supreme Court decisions of *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726, and *Moore v. Illinois*, 408 U.S. 786, 33 L.Ed.2d 706, 92 S.Ct. 2562, which struck down the death penalty as cruel and unusual punishment, the defendant's case falls within the provision of section 115—4(e) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e)), which allows only 10 peremptory challenges where the punishment may be imprisonment in a penitentiary. We note, parenthetically, that the defendant exercised seven peremptory challenges.

The defendant filed a motion to suppress certain physical evidence taken from her home. After a hearing, the court ruled that the defendant had consented to the search in which the police recovered blood scrapings from a wall and black plastic bags from the kitchen; that since a private citizen had recovered the bloody newspapers from a trash container and turned them over to the police, the defendant could not complain; and that the two-by-four board could not be admitted because it was recovered from her home without a warrant after she was in custody. The defendant argues that the State failed to prove that her consent was voluntary and, alternatively, that the search exceeded the scope of the consent. She makes no point of the admission of the bloodstained newspapers given to the police by a citizen.

Donald Britt, a friend of the deceased, told Officer Peter Kumiega of the Wilmette Police that he had found out that the defendant and the deceased had had marital troubles and that both of them had been cheating on each other; and that the defendant had threatened the deceased that she would "get her boys on him." He also told the police that he had talked to a newsman at the corner of 35th Street and South King Drive and that the newsman had noticed three or four young men in the same area with the deceased between 11 and 12 on the night of August 28. When Kumiega questioned the defendant on September 6, at the Wilmette Police Station, she said that she had no significant problems with her husband other than that she did sign a complaint against him in June of 1972. She said that she had a casual acquaintance with Melvin Loveless but had not dated him at any time. While talking to others later, Kumiega and Detective Sokolski decided to ask the defendant if they could look in her apartment to determine whether they could find anything which might indicate any dealings with "gang members." Kumiega then talked to the defendant and informed her that with her permission they would like to look at her apartment to see if they could find anything that might indicate any "gang dealings" that her husband had including papers or correspondence or anything else that might indicate who might be involved in the killing. Their concern about gang connections was based on the information that they had received from Britt. They asked the defendant if they could visit her apartment and look around. According to Kumiega's testimony, she immediately said, "Yes." The officers went with the defendant and relatives of the deceased to her apartment where Officer Sokolski scraped a bloodspot from the wall using a razor blade the defendant had given him. When questioned, she said she had cut her finger. Sokolski saw no cuts on her hands.

The following day around 9:30 p.m. Kumiega received information from Donald Britt that he and Mr. Richard Wilson, another neighbor,

entered the defendant's apartment to care for the cats and dogs of the defendant and noticed some bloody newspapers in the kitchen in the garbage can. Sokolski and Kumiega went to Britt's apartment and Britt showed them a shopping bag containing papers which appeared to have bloodstains on them. Britt told them he found the newspapers in the garbage can in the kitchen.

The officers went to the defendant's mother-in-law's home, where the defendant was staying, and asked if they could take another look at her apartment to see if they overlooked anything. Kumiega testified that she consented and accompanied them to the apartment. She had a key that she had received from Mr. Wilson. They saw a number of newspapers dated August 27 and August 28, 1972, in the garbage can which appeared to have blood on them. Kumiega asked the defendant why those newspapers were stained with blood and she told him that her dog had had her period and stained them in the living room and that she had thrown them in the garbage can. They continued speaking with her in the apartment, and she later told them that she was afraid for her life because gang members were involved in the killing of her husband. When she changed her story once or twice, she was placed under arrest and taken to Area 1 Homicide at 51st and Wentworth in Chicago. On September 8 at 5 a.m. the Chicago Crime Detection Laboratory personnel recovered the two-by-four from the defendant's apartment.

The defendant testified that she was present on the 6th and 7th when the police went to her apartment. She said that she gave them permission to enter her apartment on both those days. She got Officer Sokolski a razor blade that he used to scrape some blood off the wall. On the 7th the police asked her if they could look through the house and she told them: "You can look anywhere you want, I don't have anything to hide." At no time did she object to anything the police officers were doing in her apartment.

■■ This evidence does not portray a frightened suspect overcome by fear of police intimidation but rather a self-possessed woman with ready explanations for any seemingly damaging evidence, who sought to convince the police of her innocence by a display of complete cooperation. Indeed, she did not testify that she felt any coercion. At the time requests for permission were made, the defendant was not in custody. The trial court's finding that consent to search was voluntarily given is supported by the evidence. *People v. Henderson*, 33 Ill.2d 225, 210 N.E.2d 483; *People v. DiGerlando*, 30 Ill.2d 544, 198 N.E.2d 503.

■■ The defendant next contends that her guilt was not proved beyond a reasonable doubt. We disagree. Witnesses testified to previous threats made by the defendant against the life of the deceased. The plastic bags

in the kitchen were similar to the bag removed from the deceased's head. The blood on the wall could not be classified as human or animal blood nor typed, but the blood staining the newspapers was the same as the deceased's. We have already pointed out that the statement of the defendant amounts to a confession and shows her as more than just a bystander.

Last, the defendant contends that the sentence was excessive and the minimum should be reduced to 14 years. She was 23 years of age and had no previous record. It would serve no purpose to discuss the large number of cases reviewing sentences. It is enough to say that each case rests on its own facts. A defendant's youth, lack of a record or the fact that he did not actually do the killing have all been held to be no bar to substantial sentences. This was a premeditated murder of a sleeping man, and we believe the sentence was not excessive; and we are not persuaded to hold otherwise because the codefendant, who pleaded guilty, received a sentence of 14 to 20 years. Nor do we believe the sentence violates the concept of indeterminate sentence. (See *People v. Hemphill*, 8 Ill.App.3d 747, 748, 290 N.E.2d 270.) For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

GOLDBERG, J., concurs.

Mr. JUSTICE SIMON, specially concurring:

Brenda Green was in custody from September 8, 1972. She moved for discharge under the 120-day rule on January 19, 1973, and renewed the motion on the day of trial, April 24, 1973. I agree that her discharge was properly denied because her motions to quash arrest and suppress physical evidence filed on December 15, 1972, and her motion to suppress statements and amended motion to suppress physical evidence filed on January 19, 1973, started the running of new 120-day periods. I disagree that the discovery motion filed on November 14, 1972, was a proper reason for denying defendant's motion for discharge.

The State filed a discovery motion on the same date defendant Green's was filed. The court granted the State 15 days to respond to defendant's discovery request and the defendant 15 days thereafter to respond to the State's discovery and continued the matter for 31 days. The length of the continuance was obviously granted to provide the first 15 days for the State's answers and the second 15 days for the defendant's answers. The State did not file its answers to defendant's discovery within the time provided by the court, but did not move for any extension of that time. There is no justification for charging the defendant with delay for that

portion of the 31-day period which was provided for the defendant to respond to the State's discovery. If the defendant is charged with occasioning delay for the period of time the court granted the State to answer defendant's discovery motion, which was until November 29, 1972, the defendant was still in custody for more than 120 days thereafter.

Defendant's discovery motion was filed on the same day the public defender was appointed to represent her. The court asked whether the public defender was willing to acknowledge that the continuance would be by agreement of the parties, which would suspend the running of the 120-day period. The following then occurred:

"The Court: What is your position Mr. Lincoln?

Mr. Lincoln [public defender]: I couldn't continue it by agreement or motion defendant Green.

In filing my motion for discovery, I do not want to cause any delay in the trial.

\* \* \*

Mr. Lincoln: Only to cause a delay, such as my request for Grand Jury testimony, I would be willing to waive that part of the motion.

Mr. Goldberg [State's Attorney]: Inquire whether it will be a bench or jury.

The Court: No. He has filed his motion. Under the Nunnery case, it is motion defendant.

The record will show I am taking it as motion defendant Green
\* \* \*.

Mr. Lincoln: We will object to the motion defendant.

The Court: Objection is overruled."

In *People v. Vanderbilt* (1975), 27 Ill.App.3d 168, 326 N.E.2d 418, where a substantially similar colloquy took place, the court regarded the public defender's protests about being held responsible for delay as indicating willingness to withdraw any part of the discovery motion which would cause delay or even to withdraw the motion in its entirety, and held that the discovery motion did not occasion delay. In this case, as in *Vanderbilt*, when the discovery motion was filed, the prosecutor did not say how much time the State needed to comply. The court gave the prosecutor 10 days in *Vanderbilt* and 15 days in this case. Consistency in treatment of discovery motions should produce the same result in this case as in *Vanderbilt*.

The trial judge's reference to the *Nunnery* case in the colloquy set forth above was to the appellate court decision in *People v. Nunnery* (1972), 4 Ill.App.3d 217, 280 N.E.2d 537. It held that the filing of a discovery motion automatically extends the time for bringing the defendant to trial

for another 120 days. The supreme court reversed, however, holding that a discovery motion does not invariably cause delay. (*People v. Nunnery* (1973), 54 Ill.2d 372, 297 N.E.2d 129.) Whether such a motion should be viewed as occasioning delay caused by the defendant ·is to be determined by its timeliness, its need, and its complexity. (*People v. Thomas* (1975), 25 Ill.App.3d 88, 322 N.E.2d 597; *People v. Scott* (1973), 13 Ill. App.3d 620, 301 N.E.2d 118.) It is clear that the trial judge interpreted *Nunnery* to relieve him of exercising any discretion with respect to these factors or any similar considerations and the need to make any decision based upon them. It is not possible, therefore, to determine, as the court's opinion attempts to do, whether the trial judge abused his discretion since he assumed in granting a continuance on defendant's motion that the motion automatically commenced the running of a new term.

The discovery motion was timely. It was filed by the public defender at the earliest possible moment, on the day of his appointment; this being only the 68th day of custody, there was ample time to respond to it before the expiration of the term.

The State has not taken the position that the discovery sought by the defendant was unnecessary or that the motion was dilatory. In fact, the State did not contest any part of the motion.

The court's opinion lists the contents of the discovery motion to demonstrate that it was complex. But this approach fails to show how much time and effort were required to respond or whether the State was able to answer the motion within the portion of the 120-day period remaining, and it is these aspects of the discovery the trial judge must resolve in deciding whether it is causing delay. The public defender's request, as noted by the court, was the form discovery motion routinely used by his office, a form with which the State's Attorney's office was familiar and one which closely parallels Supreme Court Rule 412 which governs what type of discovery should be given defendants. Although in some respects the defendant's discovery motion called for information in addition to that specified in Supreme Court Rule 412, an examination of the disclosure filed by the State reveals that the State responded only to the matters in the defendant's request which are specified in Rules 412(a), (b) and (c). If this discovery motion is held to be complicated and time-consuming, every such motion filed by the public defender of Cook County would have to be appraised in the same way.

Apparently neither the trial judge nor the State thought the motion was unusually complicated, for the court granted the State only 15 days to respond, and even though his answer was not actually placed in the court records until later, the prosecutor never objected or asked for additional time. The most telling factors in determining how much time and effort

the State's response required are the brevity of the answer and the fact that defense counsel did not feel it necessary to seek more information or more detail than was provided. The entire disclosure provided by the State consisted of a list of witnesses and their addresses plus a two-page document containing eight brief paragraphs, none of them more than six lines in length. The latter document in essence represents that the State would make available such of the information as is required by Supreme Court Rule 412 either as it had in its possession, without identifying what it had, or when it received such information. In addition, the State answered that it was not aware of any prior criminal convictions of persons it intended to call as witnesses, or of any electronic surveillance of conversations to which the accused was a party, and that the State was not in possession or control of information which negated the guilt of the accused. The information referred to in its response was of the type that the State itself would require in order to try its case and, thus, the motion did not require the State to produce anything which it would not otherwise prepare.

Upon reviewing the disclosures made by the State in these two documents, I do not share the court's opinion that the discovery motion was so complicated that the answers it called for could not have been provided by diligent effort in the time allowed by the trial judge or within a sufficient length of time prior to the expiration of the 120-day period so that the trial need not have been delayed beyond 120 days. Concededly it took some effort to ascertain the existence of the matters inquired about and prepare the two brief documents which constituted the State's response to the discovery motion, but to view them as occasioning delay in proceeding to trial is in effect reinstating the *Nunnery* rule prior to its reversal by the supreme court. I also disagree with the court's expression that it is virtually impossible for the trial judge to anticipate that the answers would not be lengthy. (See *People v. Ward* (1973), 13 Ill.App.3d 745, 750, 301 N.E.2d 139.) This is an appraisal the trial judge can make with reasonable certainty on the basis of his experience with identical discovery forms together with such views as the prosecutor may offer relating to unusual features of the discovery in a particular case. Here the prosecution offered no views and was not asked for any, although it had acquired knowledge of how complex the case was and consequently how time-consuming compliance with the discovery motion might be when evidence was presented at the preliminary hearing and before the grand jury. Moreover, the trial judge, if in doubt, can leave open the question of whether defendant occasioned delay until he sees the State's answers.

The information requested by the defendant required nothing more of the State than for it to continue its preparation for trial, at the same time

advising the defendant of the information it acquired, and the State in its discovery disclosure provided the defendant with nothing more. In *Nunnery* the discovery motion was made on the 115th day of the term, at a time when the State indicated its readiness to proceed with trial. The supreme court held that no delay could be attributed to the defendant because the State in order to be ready for trial necessarily possessed the information the defendant was requesting. The court's ruling on the discovery aspect of this case would encourage defense counsel to wait almost until the moment set for trial, a time they could be sure that the State had assembled its facts, to request discovery so that, as in *Nunnery,* they could avoid being charged with delay. However, it is more orderly practice to encourage defense counsel to inform the State at the earliest possible date of their discovery needs.

Routine discovery proceedings which may require some additional effort by the prosecution, but which involved the court in nothing more than setting a timetable for responses, should not be regarded as delaying the trial; and they should not be converted by our courts into justification for delay.

The defendant's motions to suppress evidence, to suppress statements and to quash arrest were contested by the State and required an evidentiary hearing. On February 1, 1973, the public defender advised the court that he would be ready for trial after these motions had been ruled upon. The evidentiary hearing required the testimony of two police officers, an assistant State's attorney and a deputy sheriff as well as of the defendant. These motions, unlike the discovery motion, were vigorously contested and could not have been disposed of without the court hearing evidence and giving them its consideration. Although as a matter of convenience the evidentiary hearing was postponed until after the jury was picked, the trial could not proceed without this hearing. It is true that it would have been possible for the court to hold a hearing on these motions between December 15, 1972, when they were first filed and January 5, 1973, when the first 120-day period expired and then proceed to trial prior to that date, but under Illinois decisions the need for an evidentiary hearing on these motions caused the 120-day period to commence running again. (*People v. Wilson* (1974), 19 Ill.App.3d 466, 469, 311 N.E.2d 759; *People v. Schoeneck* (1971), 1 Ill.App.3d 395, 274 N.E.2d 483; *People v. Ross* (1971), 132 Ill.App.2d 1095, 271 N.E.2d 100.) The first of these motions was filed on December 15, 1972, after 99 days of the 120-day period had run. Notwithstanding the representation of defendant's counsel to the court on December 15, 1972 (set forth at length at the beginning of the majority opinion), the evidentiary hearing could not have been held that day because the witnesses had not been subpoenaed. Even

though a new 120-day period commenced on December 15, 1972, defendant Green would have been entitled to discharge because her trial did not commence until April 24, 1973, except for the fact that on January 19, 1973, she filed amended motions, as well as a new motion to suppress her statement and these started the running of a new 120-day period. It is because of these motions rather than the discovery motion that I agree defendant was not entitled to be discharged.