(No. 22269.—

The People of the State of Illinois, Defendant in Error, *vs.* Rudolph A. Cepek, Plaintiff in Error.

*Opinion filed October 17, 1934.*

Orr, J., specially concurring.

Harrington & McDonnell, (Joseph T. Harrington, of counsel,) for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, J. Albert Woll, and Henry E. Seyfarth, of counsel,) for the People.

Mr. Justice Herrick delivered the opinion of the court:

The grand jury for the criminal court of Cook county on July 30, 1931, returned an indictment against the plaintiff in error, (hereinafter called the defendant,) together with John P. Havlicek, James Friedl and Albert J. Cermak,

for the violation of section 4 of the general Banking act. (Cahill's Stat. 1933, chap. 16a, pp. 157, 158; Smith's Stat. 1933, chap. 16½, pp. 196, 197.) The indictment charged the defendants therein named with subscribing to and making and causing to be made, with the intent to deceive the Auditor of Public Accounts, a false and fraudulent report and verified statement in writing as of June 29, 1929, which was transmitted to the Auditor of Public Accounts, of the resources, liabilities and financial condition of the Millard State Bank. The indictment alleged that the statement and report were false in the following particulars: Such report and statement stated that the loans to the defendant Cepek by the bank were $15,000, when the correct amount of his loans from the bank was $91,200; that the amount stated as loans to John P. Havlicek was $500, when the true amount was $10,500; that the amount of cash, other resources and due from banks was stated to be $225,882.66, when the true amount was $155,216.30; that the overdrafts were stated to be $1193.20, when the true amount was $71,851.56; that the report stated that neither the defendant nor Havlicek had any overdrafts, which was untrue, and that the defendant had an overdraft of $71,309.59 and Havlicek had an overdraft of $200.63. The indictment was quashed as to the defendants Friedl and Cermak but was sustained as to the defendant and Havlicek. The latter were tried before a jury, found guilty and sentenced to the penitentiary. The record is brought here on writ of error sued out of this court by Cepek to review the record as to him.

Numerous errors are assigned upon the record, but in the view we take of the case it will not be necessary to pass on all of them.

It is urged by the defendant that the trial court erred in not quashing the indictment as to him. In support of this point he argues that the indictment is bad for duplicity, in that subscribing to, making and causing to be

made a false and fraudulent report with intent to deceive are separate offenses, and each separate offense should have been charged in a separate count. The issue here raised is not a new one in this jurisdiction. The same point·was raised in *People* v. *Langguth*, 347 Ill. 500, and there decided adversely to the contention of the defendant. We are not disposed to depart from such ruling, and under the authority of the decision in that case the trial court properly refused to quash the indictment as to the defendant.

It is urged that the venue was not proved. Two reasons are urged in support of this issue: (1) That the evidence does not show that the report was made and subscribed in Cook county; (2) that the office of the Auditor of Public Accounts is fixed by statute at Springfield, and that the offense was not completed until the delivery of the report was made at Springfield. The evidence is sufficient to establish, beyond a reasonable doubt, that the report was made, subscribed and sworn to in Cook county. The contention made that the offense, if any, was committed in Sangamon county is without merit.

The defendant was president and Havlicek was cashier of the Millard State Bank. The report was not signed nor verified by the defendant but was verified by Havlicek and signed by Friedl and Cermak. The People filed a bill of particulars, alleging the items on which they relied in support of the allegation that the report was false and untrue. The charge as to the defendant's connection with the transaction centers about the account designated in the report "Exchange for clearing house," given in the report as $98,552.16, and "Loans to officers and directors," as to the defendant listed at a direct liability of $15,000. It is claimed by the People that the correct amount of the item "Exchange for clearing house" was $27,885.80, and that the difference of $70,666.36 was paper of the defendant improperly carried in such account and falsely reported with the intent to deceive the Auditor. The evidence shows

as to the defendant that at the time of the report there was in the bank and carried as exchange for clearing house, seven checks drawn by him on the Millard State Bank but which checks recited on their face that they were "payable, if desired, at the Kaspar State Bank" at Chicago, aggregating $67,751.03, and a promissory note of the defendant payable to Oscar Soderquist for $2915.33. This note bears the written guaranty of Soderquist, by which he guarantees the payment of principal and interest. The evidence shows that the active management of the bank was in Havlicek; that the defendant looked after the real estate loans of the real estate department of the bank; that as to the book-keeping system of the bank, the question of accounts and the details in connection therewith all were under the direction of Havlicek and that Cepek never gave any instructions or directions as to any of such transactions. The statement involved here was made out on a blank form. Under the item of "Loans to officers and directors" there are the headings "Direct liability," "Indirect liability" and "Overdraft." No entry or any statement was made under the heading "Overdraft." On June 29 Cepek had an overdraft in his commercial account of $643.23 and Havlicek had an overdraft of $200.63. These overdrafts were included in the amount of overdrafts reported as $1193.20.

On the part of the People it is urged that the checks and note aggregating $70,666.36 should have been charged against Cepek's commercial account with the bank and carried as an overdraft. The note was not marked paid and none of the checks were marked paid. The People introduced the testimony of a bank examiner.. He classified the note and checks all in the same category and stated that they should have been charged against the defendant's account, thereby creating an overdraft, and that the report was untrue in this respect. The testimony, however, on cross-examination of the witnesses testifying for the Peo-

ple with reference to what constitutes an overdraft, was, in substance, that a check is not an overdraft until it has been charged against the customer's account and is found short, and that for checks to be properly charged as an overdraft against the defendant's account they would have to be marked paid, and that if the checks up to August 1 or 2 were not marked paid they would not be overdrafts.

The record shows that on July 17, 1929, the bank was examined by the State bank examiners. They found in the teller's cage the checks and note, totaling $70,666.36, carried as exchange for clearings. The bank examiners made up a written report of the condition of the bank. They did not direct the book-keeper or any officer of the bank to charge this note or these checks against the defendant's account but included in their report this amount of $70,666.36 under the heading of "Exchange for clearings."

At the time of the examination of the bank by the examiners the defendant's commercial account showed a balance of $7795.31. On July 19, 1929, subsequent to the examination, the Auditor of Public Accounts called the defendant into the Auditor's office in Chicago and there was a discussion with reference to the items of the checks and note aggregating $70,666.36. The Auditor requested the defendant to take these controversial items out of the bank which were being carried as exchange for clearings. On August 2, 1929, the defendant deposited in his commercial account in the bank $63,993, against which were charged the checks and the note, with accrued interest, leaving a credit of $1104.15 in such account after making the charges last mentioned. The bank continued to operate thereafter until August 15, 1930.

The testimony of a bank examiner as to the meaning of the term "Exchange for clearings" was, that such term signified checks purported to be good, drawn on other banks. He stated that he did not talk with Cepek or Havlicek at the time the bank examiner's report was made up

showing the amount of $70,666.36 included as exchange for clearings. The item charged by the indictment as debts owing as direct liabilities of the defendant to the bank, alleged to be $91,200, was itemized in the bill of particulars as a balance on loan No. 663, demand note secured by miscellaneous securities, $15,000; loan No. 1724, unsecured and paid September 29, 1929, $7500; real estate loan No. 567, $18,000; real estate loan No. 574, $26,000, and real estate loan No. 403, $24,700.

No question is made about the regularity of the $15,000 note, and it is properly shown in the report. There is considerable mystery about the note for $7500, listed as loan No. 1724. This note does not appear to have been entered on the books of the bank until September 19, 1929. By whom it was entered on the books of the bank was not disclosed, but the record does show that it was not entered on the books of the bank at the time of the report on June 29, nor did anyone testifying state that it was included in the report under the heading "Other loans" or "Loans on real estate."

The accountant for the State's attorney's office testified that real estate loan No. 567 was a first mortgage loan originally made by Elizabeth M. Cepek on September 21, 1923, as loan No. 179, and that she was joined in such loan by her husband, the defendant herein, and that when the loan matured on September 21, 1928, it was extended for a period of five years and matured September 21, 1933. Real estate loan No. 574, for $26,000, was part of a bond issue of $80,000 on property valued at $250,000, located in Crystal Vista, Crystal Lake, Illinois. The bank had purchased $36,000 of these bonds on May 4, 1929. Various sales of the bonds had been made, and later the bank on June 10, 1929, purchased an additional $5000 of these bonds, and in June, 1929, had on hand $26,000 of the bonds. Real estate loan No. 403, for $24,700, was part of a bond issue dated January 1, 1927, for $150,000,

secured by property valued at $1,100,000, located in Crystal Vista. The bank had purchased $80,000 of these bonds on February 7, 1927, and had bought and sold them to and from various people from that date, and on June 29, 1929, had on hand $24,700. Both bond issues were first mortgage bonds. The directors' minutes were offered in evidence showing the approval of the purchase of the $80,000 and the extension of the $18,000 loan.

The defendant introduced in evidence the testimony of numerous witnesses showing that he bore a good reputation for honesty and integrity and as a law-abiding citizen up to the time of the return of the indictment in the case. This reputation was in nowise attacked by the prosecution.

The real estate loans were all carried on the books of the bank as such. The bonds carried as such real estate loans were included in the report made to the Auditor. There was no juggling of the books to cover any of the real estate loans, and the report was not false in that respect.

Section 10 of the general Banking act specifically provides by subdivision 3 thereof that the purchase of or loaning money in exchange for evidence of indebtedness which shall be secured by a mortgage or trust deed upon productive real estate, the value of which is ascertained by the oath of two disinterested appraisers to be double the amount of the principal debt secured, and which mortgage or trust deed is ascertained by the opinion of a reputable attorney at law to be a first lien upon the real estate therein described, shall not be considered money borrowed, within the meaning of such section. It is not claimed that the real estate loans were not amply secured or that the provisions of the statute with reference to the title of the real estate were not observed. It was therefore not necessary, under the statute, to have listed the real estate loans in which the defendant was interested, under the heading of "Loans to officers and directors."

The evidence showed that Havlicek furnished to a stenographer of the bank a work sheet showing the condition of the bank, from which work sheet the stenographer typed the report in question. She talked the matter of the report over with Havlicek. There was nothing in the evidence to connect the defendant with the preparation by her of such report, and there is no direct evidence in the record that he had any actual knowledge, at or prior to the time the report was transmitted to the Auditor, of the making of such report or the contents thereof. The evidence against him in that respect is purely circumstantial.

There are two necessary and material elements that constitute the offense: (1) The report must be false; and (2) it must be made with the intent to deceive any person or persons authorized to examine into the affairs of the bank. In order to sustain a conviction the People must not only prove, beyond all reasonable doubt, that the defendant subscribed, made or caused to be made and transmitted to the Auditor the report in question, but the People must further prove, beyond all reasonable doubt, that the defendant either subscribed, made or caused to be made and transmitted such report with the intent then and there to deceive the Auditor of Public Accounts.

It is strenuously insisted that the court erred in refusing to give the defendant's instruction No. 9, covering the subject of circumstantial evidence. We have carefully examined this instruction. Amongst other things, it stated that the facts and circumstances, in order to justify a conviction, must be such as are absolutely incompatible, upon any hypothesis, with the innocence of the accused. The instruction should not have contained the word "absolutely." The instruction required a higher degree of proof than the law exacts, and the trial court was not in error in refusing the instruction.

Complaint is made that the trial court erred in refusing to give instruction 10 requested on behalf of the defendant.

It covered the provisions of section 10 of the general Banking act. No instruction was given by the court covering this phase of the case. It was important to the rights of the defendant that the jury be instructed as to the provisions of section 10 relative to mortgage loans because of the testimony of one of the witnesses that there was a limitation with reference to bank officers' loans; that no officer could have a larger loan than fifteen per cent of the unimpaired capital and surplus, and that there was no exception to this regulation. The assistant State's attorney in his closing argument made the statement that he believed the court would instruct the jury that the limitation on any loan was fifteen per cent of the unimpaired capital and surplus; that the capital of the bank was $100,000 and the unimpaired surplus was $15,000, "so the limitation on any loan by any person at that time was $17,250." Again, the assistant State's attorney stated: "And then, what is the reason why these defendants failed to set out that in the Auditor's report? I believe the court will instruct you that we have the right to show motive in a criminal case, and we have shown the motive here. These men knew that they could not borrow more than $17,250." The evidence in the case, as well as the statement of the assistant State's attorney, overlooked the provisions of subdivision 3 of section 10 with reference to mortgage loans. In view of the condition of the record and the statement of the assistant State's attorney the instruction should have been given, and it was prejudicial error on the part of the court to refuse such instruction.

Complaint is made that the assistant State's attorney was guilty of making improper remarks and statements in the course of his closing argument which improperly prejudiced the defendant's case. Several pages of the abstract are filled with portions of the argument objected to. One of the statements was as follows: "I want to say that so far as the State is concerned in this case we had nothing

to do with it. When indictments are voted we try them if we think the defendants are guilty; if we don't think they are guilty, why, we don't try the case." The objection made to this statement was sustained.

This statement was also made: "Now they make big capital of the facts in the case—the fact that they were not indicted until July 30, 1931. That is a year after the bank closed. He did not think we could explain that, but it is very simple—very simple. I told you the Auditor operates as a separate unit. He does not owe any allegiance to the State's attorney. He does not have to report any irregularities, if there are any. He does not have to report those to the State's attorney. And Harrington and Crowley know the State's attorney's power does not give him the right to go into any bank or corporation or any organization in the city of Chicago and look for criminal acts. They know that. They know that the State does not investigate anyone unless it has got reason for doing it. He knows that the State does not prosecute people or investigate them until complaints have been made." Mr. Crowley said: "I object to arguing what I know." The assistant State's attorney proceeded: "Further than that, Mr. Crowley is a public defender, paid from the same fund, by the people of the State of Illinois, that I am paid from. He has defended many criminals out here," etc. An objection was made and sustained.

It was improper for the prosecutor to inject his personal opinion as to the guilt of the defendant into the case by telling the jury that the defendant would not be prosecuted unless the State's attorney's office thought he was guilty. (*People* v. *King,* 276 Ill. 138; *People* v. *Black,* 317 id. 603.) The fact that the court sustained objections to the prejudicial statements did not cure the errors in the case. (*People* v. *McLaughlin,* 337 Ill. 259.) Driving a nail into a board and then pulling the nail out does not remove the hole. In the case at bar it cannot be said that

the defendant's rights were not unduly prejudiced by the statements of the prosecutor in his closing argument.

For the errors herein pointed out, the judgment of the criminal court is reversed and the cause is remanded for a new trial. *Reversed and remanded.*

Mr. JUSTICE ORR, specially concurring: I agree with the judgment in this case but not with what is said in the opinion with respect to the improper statements of the assistant State's attorney in his argument. The court sustained objections to these statements, and I do not consider that their effect was prejudicial.