The People of the State of Illinois, Plaintiff-Appellee, *v.* Jerome Payne, Defendant-Appellant.

(No. 58925; ■■■■■■■■■■

First District (1st Division)—July 7, 1975.

Miller & Pomper, of Chicago (Dale W. Broeder, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Donald M. Devlin, and Frances T. Norek, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant, Jerome Payne, was tried for the robbery of Oscar Fallin, and a mistrial was declared on May 4, 1971, because the jury was unable to agree. At a subsequent trial the defendant was convicted on April 12, 1972, and sentenced to two to four years in the penitentiary.

Oscar Fallin testified at the first trial; but he was not present at the second trial, and a transcript of his previous testimony was read to the jury. The defendant's argument is that the previous testimony was inadmissible because the State failed to show that Fallin was dead; or alternatively, the State failed to show good faith diligence or was guilty of negligence in its efforts to produce Fallin.

On April 10, 1972, two days before the second trial began, the court conducted a hearing to determine whether it would permit the introduction of the previous testimony. The State called two witnesses, Chicago police officer John Brennan and Assistant State's Attorney Donald Novelle. Brennan was a vice control officer assigned to a district and had been a police officer for almost four years. He participated in the arrest of the defendant at 2 a.m. on July 22, 1970, and at that time he interviewed Oscar Fallin. Brennan later testified at the trial which resulted in a hung jury. He had not seen Fallin from the date that the first jury was discharged. He testified that he had made approximately 20 to 25 attempts to locate Fallin, the last time three days before the trial began when he went to Fallin's former residence and checked several associates of Fallin's and several gas stations where Fallin had previously been employed. He did not name the associates, nor the gas stations, nor did he specify the times that Fallin had worked at those gas stations. He first

looked for Fallin when he received his own second trial subpoena in May or June, 1971. At that time he went to Fallin's residence at 3727 King Drive where he "understood" Fallin was living with his common-law wife. He could not remember the woman's name but could recall that there was a telephone number at the 3727 King Drive address and that it was in the woman's name. Illinois Bell had no listing for an Oscar Fallin either in May or June, 1971, or on April 10, 1972. Fallin's common-law wife was no longer living at the King Drive address and neither was Fallin. Although he had been to the King Drive address three days before the trial, he did not know the names of the people that were then living there. He last talked to someone at that address about two months before, a boy of 12 or 13 who claimed not to know Oscar Fallin or where he could be found. He made a post office check which disclosed that Fallin left no forwarding address with the postal authorities. No date of that check was given by Brennan.

He visited Fallin's station at 40th and Drexel soon after the first trial and found that it was closed and boarded up. He went to the gas station at 43rd and Vincennes where Fallin had worked on several occasions. The owner, Mr. Harper, was unaware of Fallin's whereabouts. Without disclosing his source of information, Brennan testified that he "learned" that Fallin had taken some of his tools to Johnny's Standard Station on 47th Street between Drexel and Cottage sometime around April, 1971. He went to the station on several unspecified dates and spoke there with a person named Johnny. He could not remember Johnny's last name. He remembered last being there on February 1 or 2, 1972, when Johnny told him that Fallin's tools were no longer there. Johnny did not know Fallin's whereabouts either.

Brennan went to a gas station located approximately two blocks from the 3727 King Drive address and spoke to the owner, a police officer named Jack Hightower. Fallin had worked there off and on. Brennan saw Hightower three days before the trial and was informed that Hightower did not know where Fallin could be reached.

On cross-examination Brennan testified he made no official or personal reports and made no notes concerning his efforts to locate Fallin. No one had told him at the time of the first trial to locate Fallin. He undertook the quest on his own shortly after he received the first of his own subpoenas for the second trial, sometime in June or in the summer of 1971. It was his job and department practice for him to find witnesses without instructions. His purpose in looking for Fallin was to notify him to be in court.

Before the first trial the State's Attorney's office was having difficulty locating Fallin and gave Brennan the Fallin subpoena which he served

at the address, 3727 South King Drive. In June, 1971, he went to the third floor of 3727 South King Drive, which is a Chicago Housing Authority project. He did not know the apartment number, nor the persons with whom he spoke at that time. He did not remember any names. He did, however, remember that he identified himself as a police officer when he went through the apartment. The people there did not know Fallin, nor how to reach him. He did not check with any of the neighbors. He visited the Chicago Housing Authority and requested, but was refused, permission to see Fallin's housing application because Fallin's girlfriend was the lessee. He later visited the Chicago Housing Authority office and talked to an office guard, who in turn had someone in the office checking the records. Brennan did not see the records and could not recall having asked to examine the records or Fallin's girlfriend's rental application.

He once checked, sometime in 1971, with Michael Reese Hospital to see if Fallin's girlfriend was working there. He went to Michael Reese because Hightower told him that the woman was a nurse and that he thought she was employed at that hospital. The personnel office of Michael Reese advised him that the lady was not, and never had been, employed there as a nurse.

Brennan was unaware of how one determines whether a particular individual owns a car in Illinois. He did check police records and learned that Fallin had several arrests, the nature of which was not disclosed except for the last one which was an arrest for unlawful use of weapons. Brennan had not heard and had not read Fallin's testimony at the first trial. No one, including the prosecutors, ever gave Brennan any background information to aid him in a search for Fallin; the only information he got was from people he talked with and he never talked to any of the neighbors. In June, 1971, he drove an unmarked police car around Fallin's "gas station neighborhood" and talked with various unnamed men "hanging around" at gas stations including Harper's station. None of the men knew Fallin's whereabouts. He did not know whether Harper's station was at 43rd and Vincennes or 43rd and Forrestville. He received subpoenas on six occasions; and each time he looked for Fallin in the same places that he had visited before.

He did not attempt to trace Fallin through the Social Security Administration since he did not know Fallin's Social Security number. He knew Fallin's mother was living but he never checked with her and never tried to find out her name.

Donald Novelle, an Assistant State's Attorney, testified that he made several phone calls concerning Fallin on Friday, April 7, 1972, at about 2 p.m. He called Central Records at 11th and State with Fallin's criminal identification number and was informed that the last information they

possessed on Fallin was an October, 1970, arrest. He learned from the Cook County Coroner's Office that no death certificate had been issued on Fallin. His associate called the Cook County Jail and the House of Correction and learned that neither institution had Fallin as an inmate. Novelle did not have a subpoena issued for Fallin for the second trial.

The defendant testified that the Friendly Pool Hall, with which he was familiar, burned to the ground in the winter of 1970, and was never rebuilt. Brennan had testified that the Friendly Pool Hall, which he visited looking for Fallin, was located at 42nd and Cottage Grove; but the defendant testified that Brennan was wrong and that the pool hall was located at 46th and Cottage Grove. The State offered no rebuttal.

The defendant's first contention that the death of the declarant is an essential element of the admissibility of former recorded testimony must be rejected. Decisions of the United States Supreme Court tacitly accept the proposition that only unavailability of the witness, and not just death, need be shown. (*Mancusi v. Stubbs*, 408 U.S. 204, 33 L.Ed.2d 293, 92 S.Ct. 2308; *Barber v. Page*, 390 U.S. 719, 20 L.Ed.2d 255, 88 S.Ct. 1318.) The defendant argues that this court is not bound by these Federal decisions; that they are merely standards of minimal fairness; and that Illinois courts are free to impose more stringent requirements than the Federal courts. We accept the defendant's description of our power as an abstract proposition but note that an Illinois court has already passed on the question and has held that prior testimony is admissible where the "witness cannot be located after diligent search." *People v. Burton*, 6 Ill.App.3d 879, 884, 286 N.E.2d 792, *cert. denied*, 411 U.S. 937, 36 L.Ed.2d 399, 93 S.Ct. 1917.

■■ The dispositive question, then, is whether the record discloses reasonable diligence and good faith effort to locate and secure the presence of the witness in court. Good faith and reasonable diligence depend on the facts of each case.

The responsibility for the conduct of the People's case rests with the State's Attorney, and not the police. It is his duty to supervise and coordinate the efforts to locate the witness known to be missing. This record discloses an absence of any such supervision or coordination.

When Brennan was asked if he received any instruction from anybody to look for Fallin on Friday, three days before the trial, he said: "The State's Attorney asked me if I, you know, would give it a try." The Assistant State's attorney testified as follows:

"Q. And did you tell him [Brennan] to go to look for Oscar Fallin?

A. He had already informed the State he had looked for Oscar Fallin.

Q. When?

A. I don't recall when exactly he had looked for him. He said he had been to a service station that Mr. Fallin had frequented and no one there knew or had seen Mr. Fallin.

Q. What time did you talk with Officer Brennan?

A. It was sometime subsequent to 2:00 Friday.

Q. Between 2:00 and 5:00?

A. Sometime between those hours.

Q. And he said he already looked for him?

A. At one time or another. I don't know when.

Q. Did you tell him to go look for him again?

A. No, I did not.

Q. Did he say he was going to look for him again?

A. I don't recall.

Q. Did you have a subpoena issued for Mr. Fallin?

A. I had no subpoena issued for Mr. Fallin."

The State was aware that Fallin had been a difficult witness to locate for the first trial, but took no steps to insure his appearance later even though it knew that his testimony was essential to a conviction and that the case would be tried again. The prosecutors had given Brennan a subpoena to serve on Fallin for the first trial but none for the second. Fallin had testified that he had been the manager of a Standard service station at 75th and Jeffery; the prosecutors never informed Brennan of that fact, and Brennan never checked with any Standard dealer's association. Fallin had testified that he married his wife at City Hall in 1962 or 1963; Brennan was never informed of that, and he investigated on the assumption that the woman he was seeking (whose name he could not recall) was Fallin's "common-law wife." Fallin had testified that he was with a man named Walter Anderson at Harper's station on the night of the robbery; Brennan was not informed of that and, consequently, made no attempt to locate Anderson. Fallin had testified that his wife was a licensed practical nurse; Brennan was apparently not informed of this either because his search, which was limited to one hospital, was for a registered nurse.

On the other hand, if the prosecutors had properly questioned Brennan about his search, they would have learned what he had not done, and they could have directed him to do certain things or they could have done them themselves. For example, Fallin's work records could have been checked to determine his Social Security number. Or the prosecutors could have checked his arrest records, which, if they did not contain his Social Security number, would have contained his birth date, which, in turn, would have assisted in ascertaining his driver's license

number and Social Security number. The prosecutors would have learned that Brennan had been refused information from the Chicago Housing Authority; and the prosecutors could have taken steps to acquire that information. The year 1972 was a Presidential election year, and they could have made, or directed Brennan to make, a voter registration check.

Apart from the failure of the prosecution to supervise and the failure to follow investigative leads, we judge that Brennan's conclusory testimony that he made "20 to 25 attempts" to locate Fallin is numerically impressive but qualitatively weak. As previously noted, he kept no records. He did not remember dates. He did not remember the name of Fallin's common-law wife or the names of the people occupying the apartment even though he had interviewed them three days before the trial. He never disclosed how he "learned" that Fallin had taken his tools to the station owned by Johnny, whose last name Brennan could not remember. He never disclosed how he learned that Fallin's mother was living. On each of the six occasions he received subpoenas, he looked for Fallin in the same places that he had visited before, thus recultivating fallow ground.

At the close of the hearing to determine the admissibility of the prior testimony, the court noted that the file showed that a number of subpoenas had been issued for Fallin and were returned not found. He apparently placed considerable reliance on that fact in arriving at his decision. But the subpoenas are not entitled to any weight supportive of the State's position because they are all issued to 3737 South King Drive, while Fallin testified he lived at 3727. The prosecutor and police never told the Sheriff's Office that the address was 3727 and that the witness had gone. If anything, the subpoenas highlight the lack of coordination in the effort to locate Fallin.

It must be kept in mind that the admission of prior recorded testimony is an exception to the constitutional right of confrontation. (*Barber v. Page*, 390 U.S. 719, 722, 20 L.Ed.2d 255, 88 S.Ct. 1318.) And the State has the burden of proving that the steps it took to procure the attendance of the missing witness were reasonable under the circumstances.

In our view, approval of introduction of the former testimony under these facts would encourage laxity rather than diligence and desultory searches rather than systematic and coordinated efforts by the prosecution and whatever investigative arm it employs. We believe the case upon which the State relies, *People v. Burton*, 6 Ill.App.3d 879, 286 N.E.2d 792, is distinguishable factually. *Burton* involved a reversal six years after conviction. Consequently, unlike this case, the prosecutors were not placed on notice that a new trial would be required. Two experienced

investigators of the State's Attorney's staff were assigned to locate four witnesses. Apparently they were successful in locating two of them. Their investigation lasted 10-14 days and unlike Brennan, they kept records of their interviews with the missing witnesses' neighbors or ex-neighbors and with all persons in the vicinity of their last reported addresses. Again, unlike Brennan, they made voting registration checks including a personal visit by both investigators to an election commissioner; a post office check for forwarding addresses; the telephone directory; and personal interviews with the man who owned the apartment building for ten years where one witness reportedly last lived and with a minister who lived for the past nine years at the last known address of the other. Unlike this case, they had no record of previous employment of the missing witnesses; consequently, they were unable to check on the last known place of employment. Unlike Brennan, they left a phone number for the persons they interviewed to call. Moreover, it must be emphasized, they were walking over a trail six years, not four months, old.

For these reasons we judge that the State failed to maintain its burden of showing due diligence in the procurement of the appearance of the absent witness, Oscar Fallin, and, therefore, his prior recorded testimony should not have been admitted. The judgment of the circuit court is reversed and the cause remanded for a new trial.

Judgment reversed and cause remanded.

GOLDBERG and SIMON, JJ., concur.