THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM TENNANT, Defendant-Appellant.

(No. 59628;

First District (1st Division)—October 6, 1975.

SIMON, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Donald M. Devlin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

During the early morning hours of August 2, 1972, a Chicago police officer, responding to a radio call concerning a battery victim, entered an apartment on the south side of the city. He found a dead man lying in a bed. It was apparent that the cause of death was traumatic injury to the skull and face. In due course, William Tennant (defendant) was indicted for the murder of the deceased. After trial by jury, defendant was found guilty and sentenced to a term of 15 to 30 years. He has appealed to this court.

Defendant has raised three contentions: he was denied due process when the trial court permitted a transcript of the testimony of a deceased witness (Willa Watson) given at a preliminary hearing to be

read in evidence; the evidence was not sufficient to prove him guilty beyond a reasonable doubt and the trial court erroneously refused an instruction tendered by defendant pertaining to an admission and instead gave an instruction tendered by the State regarding a confession.

The People contend that the evidence given by Willa Watson at the preliminary hearing was properly admitted; defendant was proved guilty beyond a reasonable doubt and the jury was properly instructed with reference to the statements of guilt made by defendant.

When the officer originally came to the apartment, there was no response to his knock. He left and shortly thereafter received a second call concerning the same addess. He was then admitted to the third floor apartment by Herbert Cross, a blind person. The apartment, originally six rooms, has been modified for use as four sleeping rooms with a common kitchen and bathroom. The front entrance door may be locked but not the rear door. Also, there are no functioning locks on the doors of any of the individual rooms.

It appears from the testimony of the officer that he found the body in one of the rear bedrooms which was ordinarily occupied by defendant. The deceased was lying face up in the middle of the bed. There was blood spattered onto the bed and on the wall. There were traumatic injuries to the head and face. The defendant was then absent. He came in while the officer was speaking to a lady named Willa Watson. She occupied two rooms in the front part of the establishment with Harry Housely. A man named Peter Reeves occupied a room located to the rear.

After the officer had entered the apartment, he awakened Willa Watson and Harry Housely. When Miss Watson appeared she was dressed in a nightgown and her head was bandaged. She identified the deceased.

The officer had a conversation with defendant. When defendant approached, the officer noted some red spots on his clothing and on his shirt near the collar and close to the shoulder. He also saw a red substance near the fly and on the right leg of defendant's trousers. Upon examination of the bathroom, the policeman found a red substance which he described as being a "blood-type" in the basin. There was also a dress soaking in the bathtub in water which had "a reddish tint." Water similarly tinted was found in a small bucket in the bathtub. Willa Watson told him that she had received a head wound earlier in the week and that her dress was stained with blood. After receiving *Miranda* warnings, defendant stated that he had been at his sister's apartment. When he returned, he got into his bed and laid down next to the deceased. He then nudged the deceased so that he could request some money for the purchase of wine. Receiving no response, he then looked closely at de-

ceased and observed his condition. He then got out of bed and called the police. He said that he had made two calls to the police station. At the officer's request he removed and surrendered his clothes.

The officer then spoke with Peter Reeves who lived in the same flat. In his room the officer noted a piece of metal some 3 feet long leaning against the door of the refrigerator. He gave this piece of metal to the technicians. They dusted it but told him that they could find no fingerprints, although there was a reddish stain on the end portion of the bar. The officer also noted a few drops of a "red substance" on the floor some 3 to 5 feet inside the room occupied by Willa Watson.

Over objection by defendant, the trial court permitted the reading to the jury of a transcript of the testimony given by Willa Watson at a preliminary hearing against defendant, held August 17, 1972. The parties stipulated that Willa Watson died in Chicago on January 3, 1973, before commencement of trial.

She had testified for the State and she was cross-examined by counsel for defendant. Her testimony was that she had known defendant for 6 years but knew the deceased for 6 months. She, defendant and deceased had spent the evening and early morning hours together drinking on the back porch of the apartment. The deceased left the others about 2:30 a.m. At about 3 o'clock she went to bed. At that time she saw the deceased sleeping in defendant's bed. She was awakened when defendant knocked on her door and asked her if he could come in to get some clothes which she kept for him. She could not estimate when that occurred. Defendant came in, got his things and left, carrying the metal bar. She then heard defendant say "get out of my bed  *  *  *" with the addition of an obscenity.

Defendant later reentered her room and threw "the iron pipe" down on her bed or by her bed. He later came back and got the piece of iron once more. It was hers and she had used it to hold the broken door of her refrigerator closed. It was found by the police in the room of Peter Reeves. At the request of the police, she identified the piece of iron as being hers. She stated that it was a part of an iron bed rail, cut to a length of about 2 feet. The cross-examination of this witness by counsel for defendant took approximately 12 pages of the record, while the direct examination took 9 pages. No substantial differences of any kind were developed by the cross-examination.

Two homicide investigators of the police department also came to the apartment that morning. After examination of the scene, they returned to the police station where they took statements from Willa Watson and Peter Reeves. These statements were then typed and signed by the witnesses. That same morning they interviewed defendant. One of the in-

vestigators gave defendant legal warnings which defendant said that he understood. The investigator further testified that defendant then told him he had not been home all night but he had been at his sister's home. Defendant then made a statement to the investigator quite similar to that which he had told the first police officer concerning his alleged discovery of the death of deceased.

At defendant's request, he then left the room unaccompanied to get some water. When he returned, the officer told him that he knew from his investigation that defendant had been in the apartment all evening drinking with the other tenants. After further talk, defendant stated that he would tell the truth and he said that he beat the deceased with the angle iron and killed him. This entire conversation and questioning took approximately 10 or 15 minutes. Aside from deleted expletives, the defendant told the officer that he killed the deceased because he was "picking on him." The investigator asked defendant if he would repeat that statement to an Assistant State's Attorney which defendant said he would.

Marshall Weinberg, then an Assistant State's Attorney, was in private practice when he testified. He testified that he introduced himself to defendant and asked him if the police had advised him of his constitutional rights. After receiving an affirmative answer, the witness again advised defendant of his rights. He asked defendant if he was the one who had struck and killed the deceased and defendant "indicated that he had done it." He asked defendant why he had killed the man. Defendant responded that the deceased "had taken my food stamps and other things." The witness testified that apparently defendant and deceased were roommates. Defendant told him in effect that he had occupied the room and that the deceased was an interloper.

In further conversation, the defendant stated that he had struck the deceased with an iron bar. Mr. Weinberg then suggested to defendant that a court reporter be called so that he could repeat his statement and have them written. Defendant then said that before he would sign anything he wished to talk to an attorney. The witness further testified without objection that he then went to his office and made a written memorandum of the statement given him by defendant. Two days later this memorandum was typed by a secretary and signed by the witness. It was exactly the same as his handwritten version. The memorandum was marked as an exhibit. It was the subject of cross-examination by counsel for defendant. The court sustained a defense objection and rejected this exhibit. Additional cross-examination of this witness by counsel for defendant will receive later consideration.

The parties stipulated that if a certain pathologist for the coroner were

called he would testify that death of the victim was caused by a skull fracture which resulted in brain laceration.

Evidence for the defense showed that the police laboratory had found that blood of the deceased was type "O". The same type of blood was present on the bed where the body was found and near the collar of defendant's shirt. The front of the shirt and defendant's trousers both showed blood types of "O" and "A" so that these tests were not conclusive. The metal bar above described also had blood types "A" and "O" but predominantly "A" so that it could not be classified as type "O".

Defendant's niece, Barbara Hunter, some 17 years old, testified that, commencing midnight of August 1, 1972, defendant visited the home where she lived with her aunt. She stated that defendant had spoken briefly to her and her aunt but had fallen asleep because he had been drinking. When defendant left, at about 4 a.m., the witness was watching a picture on television. She watched Channel 9 and continued her viewing until 6 or 6:30 a.m. The parties stipulated that, if called, personnel from this station would testify that the station "signed off" that morning at 3:10 a.m. plus 30 seconds. The aunt of this witness was in the hospital at the time of trial.

Defendant testified that the angle iron had been used on Willa Watson's refrigerator. He had helped her close the refrigerator with it before noon on August 1. He did not see it again until it was found in the room of Peter Reeves. Defendant testified that he had worked as a welder but eye surgery had terminated his employment. The parties stipulated that an examination of defendant's eyes in August of 1972 found that he had glaucoma and the lens of his left eye was gone. The sight of this eye was poor and even with glasses the vision of his right eye was 20/60. On August 2, his glasses had been broken and they were being repaired.

Defendant further testified that he had helped the janitor in the building until about 8 o'clock on the evening of August 1. Some three hours later he walked to his sister's home and spoke to her and his niece. He dozed off and awakened about 4 a.m., when he left. On the way home he passed a clock near a window which showed 4:15 a.m. At home he lay down in his bed next to deceased. Deceased had stayed with him before as they were friends. He could not see in his room because of the absence of his glasses and because the switch on his room light did not work. He then opened his refrigerator door which gave some light and leaned over close to the face of the deceased. He went over to Willa Watson and asked her about deceased because the face had appeared "wet." He then called the police twice. When he saw them arrive, he returned to the apartment from where he had gone to use the telephone.

Defendant testified that he had spoken with the police officers and

with the State's Attorney but he denied that he had told any of them that he had struck or killed deceased. The State's Attorney gave him a paper to sign but he could not read it without his glasses so he refused to sign.

■■ The first point raised by defendant is directed to the propriety of reading to the jury the testimony of the deceased Willa Watson given at the preliminary hearing. We have above summarized this testimony and have shown the extent of the cross-examination.

Defendant's brief virtually concedes that no rights of a defendant are violated by reading the previous testimony of a deceased witness if "at the preliminary hearing or former trial, the accused had been accorded an adequate opportunity to cross-examine such witness." (*People v. Coburn*, 20 Ill.App.3d 60, 63, 313 N.E.2d 270, quoting the general rule from 3 Wharton's Criminal Evidence § 650, at 371-374 (13th ed. 1973).) Defendant, however, raises the point that cross-examination at a preliminary hearing can never be full and adequate because under Illinois law defense counsel has no right to discovery until after this hearing. (Supreme Court Rule 411, Ill. Rev. Stat. 1973, ch. 110A, R. 411.) If this contention were accepted, testimony of a witness who died after the preliminary hearing could never be used. It seems more logical and reasonable to permit the use of this testimony provided that there was no significant limitation upon the free exercise of the right to cross-examine by counsel. This statement of the rule was approved by the United States Supreme Court in *California v. Green*, 399 U.S. 149, 165, 166, 26 L.Ed.2d 489, 90 S.Ct. 1930, where the Court noted that the rights of defendant's counsel were not "significantly limited in any way in the scope or nature of his cross-examination of the witness Porter at the preliminary hearing." This rule has been firmly adopted in Illinois. For us to review the many decisions which so hold, in addition to *Coburn*, would be a needless repetition. We find an excellent statement of the rule and a listing of the applicable authorities in the recent decision by this court in *People v. Beathea*, 24 Ill.App.3d 460, 465, 466, 321 N.E.2d 458.

We find no constitutional problem flowing from the use of the prior recorded testimony. Admission of such testimony in a proper case has long been an exception to the basic constitutional right of confrontation of the prosecution witnesses. (See *Barber v. Page*, 390 U.S. 719, 722, 20 L.Ed.2d 255, 88 S.Ct. 1318.) Nor can a situation involving a deceased witness be equated with a situation involving a witness who *is* simply missing. In the latter type of case, the State must prove that it has made an actual and good faith effort to locate the missing witness. (*People v.*

*Payne,* 30 Ill.App.3d 624, 332 N.E.2d 745.) In the case of the deceased witness, we are not concerned with prosecution good faith but simply with a preliminary determination as to whether the defendant has had an ample opportunity to cross-examine the witness as a test of reliability. As pointed out in *Beathea,* "the testimony of a witness at a preliminary hearing is admissible into evidence at trial when the witness is unavailable without fault on the part of the State and when ample opportunity to cross-examine had existed at the preliminary hearing." 24 Ill.App.3d 460, 465.

No case has been called to our attention, nor do we believe one exists, holding that an additional duty must be imposed upon the trial court to make a predetermination concerning reliability of the testimony. Following this rule would simply add another and unnecessary burden to the function of the trial court which would be obliged, in every such instance, to conduct a complete trial within a trial with the result dependent directly upon an evaluation of the testimony of the absent witness in connection with *all of the other evidence.* This task would be far more burdensome than hearings on admission of confessions or identifications both of which can be decided only on testimony pertinent to the specific inquiry. This would be an infringement upon the function of the jury to determine credibility of all of the witnesses.

In the case before us, the cross-examination of the witness Willa Watson at the preliminary hearing was detailed and complete. There was no significant limitation of any kind upon the full and free right of cross-examination as actually exercised by defendant's counsel at the preliminary hearing. Thus, we are dealing with a situation in which the rights of defendant were not violated by reading the transcript of her testimony to the jury. If we were to adopt the blanket and inflexible ruling of exclusion urged upon us by defendant, the result reached would be contrary to the authorities above noted and to the many cases therein cited.

■■ In considering the sufficiency of the evidence to prove guilt beyond a reasonable doubt, defendant relies upon several collateral contentions. Defendant first points out the alibi evidence supplied by his own testimony and that of his niece. The contention that the State was unable to refute the alibi is not entirely correct as the rebuttal evidence regarding the time that the television station, which defendant's niece said she was viewing, ended its broadcast, does tend to discredit her testimony. In addition, defendant first told the police that he had been visiting his sister at the time but this is contradicted by his own subsequent confession repeated to a police officer and to an Assistant State's

Attorney. In addition, defendant's alibi was badly shaken by the testimony of the deceased Willa Watson regarding his activities in her presence at the time in question.

It is correct that when a defendant has presented proof of an alibi he is not bound to prove this defense beyond a reasonable doubt. The burden of proof remains upon the State to prove the defendant guilty as charged beyond a reasonable doubt. (*People v. Brown*, 52 Ill.2d 94, 105, 106, 285 N.E.2d 1.) However, there is no obligation on the trier of fact, be it court or jury, to believe alibi testimony. (*People v. Jackson*, 54 Ill.2d 143, 149, 295 N.E.2d 462.) In addition, the fact that there is alibi evidence which conflicts with the proof adduced by the State does not in itself require that this court reject the verdict of the jury. Despite the presence of alibi testimony in the record, it remains "the function of the jury to make a determination of the credibility of the alibi witnesses and of the weight to be given to the totality of the testimony." See *People v. Brown*, 52 Ill.2d 94, 105, 106.

■■ Defendant next urges that, having failed to call other available witnesses, the State must accept the risk of possible negative inferences being drawn by their failure to do so. It has frequently been held that the State "is not obliged to call every witness who might testify concerning evidence of the crime." (*People v. Farnsley*, 53 Ill.2d 537, 545, 293 N.E.2d 600.) This rule is also set forth in *People v. Davis*, 19 Ill.App.3d 848, 312 N.E.2d 343, cited by defendant. It is conceivable that failure of any litigant to call a designated witness could correctly become the subject of negative inference but it does not appear that such inference was actually made at trial or could properly have been made. Defendant directs this contention at the failure of the State to call Peter Reeves and the blind man Herbert Cross. There is nothing in this entire record to indicate that Cross had any knowledge of any material fact or was ever questioned on these matters. Reeves, the other witness, made a statement to the police which was disclosed to defendant in the answer to his discovery motion filed by the State. If this statement contained evidence which would have been helpful to defendant, there is no showing that this witness was not readily available to defendant and his address was listed in the discovery response.

■■ Defendant urges that testimony by the former Assistant State's Attorney was prejudicial to defendant. The State's Attorney testified on cross-examination by defense counsel regarding the function of the Felony Review Unit to which he was assigned and also expressed the opinion that he would not approve a case for prosecution if it was "other than a good case." This subject was not brought out or covered in any

manner on direct examination. Defendant cites and depends upon cases such as *People v. Cepek*, 357 Ill. 560, 192 N.E. 573, where the prosecutor made an improper closing argument concerning his opinion of guilt; *People v. Adkins*, 16 Ill.App.3d 394, 306 N.E.2d 709, which involved a similar situation and *People v. Mostafa*, 5 Ill.App.3d 158, 274 N.E.2d 846, where a former Assistant State's Attorney testified on direct examination regarding his opinion as to whether a crime had been committed by a third party. None of these authorities are applicable here.

In the case before us, all of the testimony of the former Assistant State's Attorney, to which defendant now takes exception, was deliberately and intentionally brought out by defendant at trial. This is conceded in defendant's reply brief which states that this was expressly brought out by defendant and was "an effective job of revealing the witnesses' interest in the case." The cases are numerous in taking the most logical position that "a defendant may not interject an issue into his case and then contend that the bringing of it to the attention of the jury was erroneous." (*People v. George*, 49 Ill.2d 372, 379, 274 N.E.2d 26. See also *People v. Burage*, 23 Ill.2d 280, 282, 283, 178 N.E.2d 389.) The defendant here, as a matter of tactics, himself elected to bring the alleged bias of the witness before the jury by this cross-examination. Now that this strategy has failed, defendant is not in position to make a complete turnabout and attempt to benefit from alleged error which he himself purposely created. *People v. Dixon*, 37 Ill.2d 416, 226 N.E.2d 608.

Considering the general argument regarding proof of guilt beyond a reasonable doubt, we come to the conclusion that the evidence amply supports the verdict reached by the jury. The testimony of Willa Watson places defendant on the premises during the crucial hours in direct contradiction to his alibi. This testimony also shows that defendant, after drinking for some time, entered her room and spoke briefly to her. He left with some of his clothes and the iron bar. She had also noticed the deceased occupying defendant's bed a short time before. She heard defendant swear violently at the deceased and order him to leave the bed. She testified that defendant then reentered her room, threw the iron pipe down and left, but that he later came back and removed the pipe. This is corroborated by defendant's own confession regarding his anger toward the deceased. The physical evidence shows blood spattered on defendant's clothes in several areas. Some of this was shown by tests to be of the same type as that of deceased. Also of convincing probative importance is the confession made by defendant after he had made contrary statements to the police. In addition, there is defendant's confes-

sion to the former Assistant State's Attorney. It is true that defendant denied these confessions but there is strong conflicting testimony by two witnesses.

In this appeal, as in most other similar situations, it is possible to raise various arguments concerning the weight of the testimony as counsel for defendant have done. Most of these arguments may readily be explained by counterarguments. For example, defendant points to the lack of fingerprints or blood of the same type as the deceased upon the angle iron. Someone apparently was responsible for cleaning this weapon which seemed from the evidence actually to be the murder weapon. Defendant first brought the angle iron back to Miss Watson's room, then came out and removed it and it was found by the police in the room of Peter Reeves. The argument regarding defendant's poor eyesight is advanced. It is true that this unfortunate condition would create sympathy for defendant's plight but this does not rebut the evidence that defendant was actually the killer. It is also true that defendant called the police twice to report the presence of the dead body. This evidence in itself does not tend to exonerate defendant.

As regards the presence of the bloody dress soaking in the bathtub, this is at least partially explained by the statement made by Willa Watson concerning her head wound at or about that time. Similarly the stains on the floor in her room may logically be explained by the evidence that defendant threw the bar down on the floor. Also, failure of the record to explain each and every factual detail is not as important as is the weight of the totality of the evidence tending to prove defendant guilty.

It is only in the rarest case that the evidence of guilt is so overwhelming that no argument to the contrary and no conflict in the evidence appears. In our opinion, this record presents the usual case of conflicting evidence which went to the jury after a trial free from substantial error in which the jury was properly instructed. The jury in this case had the duty "to judge the credibility of witnesses, weigh the testimony and determine matters of fact. The determination of the jury will not be disturbed unless the evidence is so unsatisfactory as to justify a reasonable doubt of guilt." (*People v. Benedik*, 56 Ill.2d 306, 310, 307 N.E.2d 382.) This principle has been described by the Supreme Court as axiomatic. *People v. Glover*, 49 Ill.2d 78, 84, 273 N.E.2d 367.

■ It is true that where the evidence " '* * * is not sufficient to remove all reasonable doubt of the guilt of the defendant and to create an abiding conviction that he is guilty, the conviction will be reversed.' " (*People v. Hister*, 60 Ill.2d 567, 573, 328 N.E.2d 531.) Our study of the record here convinces us that the verdict of guilty is amply supported by the evidence. In such a situation, we cannot " '* * * lightly take

the step of reversing a jury's determination of guilt'." *People v. Hister*, 60 Ill.2d 567, 573.

The remaining point raised by defendant involves a classification of the evidence by the police and the former State's Attorney regarding defendant's own statements to them concerning his guilt. Defendant tendered an instruction relating to admissions. (IPI—Criminal No. 3.06.) The court refused this instruction and instead gave the jury one tendered by the State concerning a confession. (IPI—Criminal No. 3.07.) Both of these instructions, aside from respective use of the words "admission" and "confession," told the jury that it was their duty to determine whether defendant made the admission, or confessed, and if so what weight should be given thereto with consideration of all of the circumstances under which the admission or confession was made.

■■ There is a distinction in law between an admission and a confession. Actually an admission is not a complete acknowledgment of guilt as is a confession. A confession has been defined as "a comprehensive admission of guilt or of facts which necessarily and directly imply guilt." (*People v. Rollins*, 119 Ill.App.2d 116, 131, 255 N.E.2d 471, *leave to appeal denied*, 43 Ill.2d 398.) In the case before us, both of these statements by defendant are indeed comprehensive admissions of guilt and of facts which necessarily and directly show guilt. Defendant told both of his interrogators that he had killed the deceased. He included a statement of the murder weapon and even went so far as to state the reasons for his attack upon the victim. In this situation, no complicated set of facts is required to constitute a "comprehensive admission of guilt." We therefore conclude that the statements of defendant were correctly classified as confessions and that the jury was properly instructed. A recent case citing *Rollins* and reaching the same conclusion in response to the same argument is the opinion of this court in *People v. Green*, 30 Ill.App.3d 1000, 333 N.E.2d 478.

The judgment appealed from is accordingly affirmed.

Judgment affirmed.

EGAN, J., concurs.

Mr. JUSTICE SIMON, dissenting:

Under proper circumstances prior recorded testimony can be admitted against a criminal defendant without violating the confrontation clause of the sixth amendment; this is not such a case. I do not read *California v. Green* (1970), 399 U.S. 149, or *Barber v. Page* (1968), 390 U.S. 719, cited by the majority as support for an absolute rule of admissibility allowing the use of preliminary-hearing testimony any time a witness is un-

available and an opportunity to cross-examine was presented at the preliminary hearing. In addition, neither case deals with the type of due process problem that arises in the case before this court where, on the face of the record, the earlier testimony appears to be so unreliable as to create a great danger of misleading the jury.

In *Green,* the witness whose prior testimony was admitted also testified at the trial. Consequently, there was no need for the court to satisfy itself that his prior testimony was reliable, or to scrutinize it as it might have felt compelled to had the witness been absent. Nor was there anything questionable about the witness' preliminary-hearing testimony other than his own statement at trial that he took LSD shortly before the events about which he testified at the preliminary hearing and as a result was unable to remember what actually happened or to distinguish fact from fantasy. Any doubt raised by the witness' trial testimony could be resolved by the trier of fact because it had the opportunity to observe and hear the witness and to consider trial and preliminary-hearing testimony. Nothing in *California v. Green* indicates that the court would have been unconcerned about accepting the preliminary-hearing testimony of a witness unavailable for cross-examination at trial if other evidence established he was under the influence of a hallucinogenic drug during the incident to which he testified.

Also, in *California v. Green,* the witness testified about a conversation with another person at which no one else was present. In this case, there were three persons beside Willa Watson who were as close or closer to the events covered in her testimony as she was.

In *Barber,* the Supreme Court was faced only with the issue of whether a witness was actually unavailable. *Barber* held that preliminary-hearing testimony was erroneously admitted in violation of the confrontation clause where the "missing" witness was in prison and the prosecution made no effort to secure his presence at trial. Under those circumstances there was no showing that the witness was unavailable. The court there was not faced with the claim that the preliminary-hearing testimony was too unreliable to be left to the jury. Thus, neither *Green* nor *Barber* create a rule permitting the use of such testimony as was admitted here.

Nor are *People v. Beathea* (1974), 24 Ill.App.3d 460, 321 N.E.2d 458, and *People v. Coburn* (1974), 20 Ill.App.3d 60, 313 N.E.2d 270, precedents on which it is safe to rely, for in those cases there were other witnesses at the trial who corroborated the testimony of the dead witness. The unavailable witness, Willa Watson, was the only person, other than the defendant, who was in the apartment before the police arrived, and whose testimony was offered.

Recently, this court set aside a conviction because the State failed to

make an adequate search for a witness whose testimony at the first trial of the accused, which ended in a mistrial, was introduced at the second trial. (*People v. Payne* (1975), 30 Ill.App.3d 624, 332 N.E.2d 745.) The reason for that result was not because the prosecution was penalized for ambivalence in locating a witness, but rather because the law recognizes the dangers in the reading of a cold transcript instead of permitting the jury to observe the demeanor of a live witness. When the State is required in protecting the accused's right to confrontation to take such great care to produce a live witness even where there was full cross-examination in a prior adversary trial in preference to reading that prior trial testimony, a rule which admits without careful scrutiny of its reliability the preliminary-hearing testimony of a person unavailable at trial is neither logical nor reasonable.

To provide due process under the fourteenth amendment and to satisfy the requirements of the sixth amendment of the Constitution of the United States, the trial judge, before admitting prior recorded testimony, must be satisfied that it will not lead the jury into error. Such an inquiry is not likely to require burdensome efforts by the court since it principally involves an examination of the testimony the prosecution is seeking to introduce as well as the other evidence which is introduced at the trial. The areas of inquiry suggested by the evidence in this case which the court should have considered in exercising its discretion and which the cross-examination of Ms. Watson failed to cover were her ability and opportunity to observe the events about which she testified, whether she had any motive to be untruthful, and whether other witnesses to the same incident were available.

Nor can the failure to have cross-examined in these areas be said to constitute a waiver. (See *Barber v. Page* (1968), 390 U.S. 719, 725.) It is not unusual for the preliminary hearing to be held before counsel is sufficiently acquainted with the facts to suspect that the capacity of the witness to observe or remember might have been impaired or that a bias exists. If cross-examination did not extend to these areas because the public defender did not have sufficient time to investigate them or knowledge of the facts to appreciate their relevance, the mere opportunity to cross-examine cannot be realistically regarded as meaningful. Without a real opportunity to cross-examine a defendant is not afforded his confrontation and due process rights.

Because the evidence raises serious doubts as to Willa Watson's credibility, her testimony is not sufficiently reliable to be left to a jury for evaluation, as we would do in the case of a witness whose demeanor the jury could observe. While the function of the jury is to determine the credibility of witnesses, as Justice Brennan pointed out in his dissenting

opinion in *California v. Green* (1970), 399 U.S. 149, 198, "[n]o such determination of credibility is possible when the witness comes before the trial factfinder by the reading of a cold transcript." Testimony may be so inherently improbable, and contain internal contradictions, inconsistencies and omissions so extensive that it is self-impeaching. Such testimony when offered by a live witness presents questions of weight and credibility, and the trier of fact is free to ignore such testimony even though no contradictory evidence is offered. (*Quock Ting v. United States* (1891), 140 U.S. 417; *People v. Malmenato* (1958), 14 Ill.2d 52, 150 N.E.2d 806; *People v. Davis* (1915), 269 Ill. 256, 110 N.E. 9; *People v. Booher* (1966), 73 Ill.App.2d 226, 218 N.E.2d 779.) However, where the evidence is offered in the form of a transcript of preliminary-hearing testimony, as Justice Brennan observed, the trier of fact is confronted with a different and more difficult setting in attempting to determine whether it should be ignored. Inconsistencies which might be apparent during the give-and-take of live interrogation slip easily past the ear when read dispassionately from a transcript. Defense counsel is deprived of the opportunity to bring home to the jury the contradictions, inconsistencies and omissions by playing upon them during live cross-examination. The very fact that the evidence is read from a written document may lend it credibility that it would not have were it presented live. Therefore, fairness requires that the court take the precaution of testing a missing witness' preliminary-hearing testimony for reliability before admitting it into evidence. Here the court erred in admitting Ms. Watson's preliminary-hearing testimony because it was so unreliable that it created too great a likelihood of misleading the jury.

As to Ms. Watson's capacity and opportunity to observe, we know from testimony given by others at the trial, but not from her own cross-examination, that she had been drinking from at least 7 p.m. the night before the murder, and that she went to bed about 3 a.m. She was never asked at the preliminary hearing how much she drank and over what period of time, and the record does not demonstrate whether she was sober enough after going to bed to have the capacity to observe and remember what happened. She testified about the comings and goings of the defendant in her room during the early morning hours after 3 a.m., but the record does not establish whether there was enough light in her room to see what occurred. The police arrived at approximately 5:45 a.m. and one of the officers testified he had to use a flashlight to examine the body of the deceased in the defendant's room. Police officers testified that Ms. Watson was wearing a wrinkled nightgown, was blinking and rubbing her eyes, that she had been asleep, and that she was "very droopy eyed like she had just gotten up." These facts, not inquired into on her cross-

examination, are sufficiently important to raise serious doubt about whether she was too intoxicated or too sleepy to observe and remember with accuracy. Since she was not able to relate any exact or approximate intervals of time between the incidents which her testimony covered, she could have conceivably confused the sequences as one who is awakened several times from sleep after a long night of drinking might easily do. In fact, her testimony about the defendant's entries into her room, as pointed out below, was self-contradictory and confused.

There is also a serious doubt about Ms. Watson's motive in testifying as she did. Blood found on the floor of her room after the murder was never satisfactorily explained. If it came from the metal bar referred to in her testimony and if that bar had been used to beat the deceased to death, there was no explanation of the absence of a trail of blood from the room where the murder occurred to the bloodstains in Ms. Watson's room. According to the testimony of the police officer, Ms. Watson attributed the reddish tint in the bathtub water in which her dress was soaking and the reddish tint in the small bucket in the bathtub to a head wound she suffered earlier in the week which bloodied her dress. It is possible that the bloody dress, together with red stains in the basin of the bathroom in the premises where the murder occurred, may have been connected with the murder. If so, Ms. Watson had a motive for testifying in a way which directed suspicion to the defendant.

Three other persons were as close or closer than Ms. Watson to the bed on which the murdered man was found. Mr. Cross although blind could have heard the conversation Ms. Watson claimed she heard when she testified defendant said, "Get out of my bed." No explanation was offered as to why Harry Housely who was in the same bed with Ms. Watson when the incidents occurred was not called as a witness. Nor was there any explanation as to why Peter Reeves, in whose room the supposed murder instrument was found, could not be called as a witness at trial in place of or in addition to reading the preliminary-hearing testimony of the dead witness. The police officer who conducted the investigation testified that based upon the statements of Ms. Watson and Mr. Reeves, he concluded the defendant was lying. Therefore, it is apparent that Reeves must have had information which showed the defendant's guilt. It is correct, as the majority points out, that the State is not obliged to call every witness who might testify concerning evidence of the crime. This, however, does not justify the State's failure to call any of the witnesses who were in the apartment at the time of the murder or to explain why they were not being called, and its reliance instead only on testimony not subject to cross-examination.

The danger of Ms. Watson's preliminary-hearing testimony is high-

lighted by the number of factual questions raised and left unanswered by the evidence. Ms. Watson testified the defendant brought the metal bar back in her room. There is no explanation as to how the metal bar then got to Peter Reeves' room. Nor was there any explanation of the lack of fingerprints on the murder instrument or the blood on the floor of Ms. Watson's room. The only explanation of the bloody dress was a police officer's testimony at the trial regarding what Ms. Watson told him outside the presence of the defendant. The bloody dress was not referred to by Ms. Watson at the preliminary hearing and counsel did not cross-examine her about it.

Additional unanswered questions were raised by the blood on the metal bar which the State claimed was the murder instrument and which Ms. Watson's testimony placed in defendant's hands. There was no testimony that this substance was not on the bar before the murder. The blood was dried when the police officer found it around 6 a.m., and could have been there a long time. Particles of flesh and bone were lying about the victim's head and body, but no particles of bone, flesh or hair were found on the bar. While blood from the victim tested as O-type blood, the Chicago Police Department's microanalyst testified that the blood on the metal bar was not group O.

Finally, much of Ms. Watson's testimony was confused and self-contradictory. She testified that after she went to bed she did not hear anything unusual that night. But she also testified that after the defendant's first appearance in her room she fell asleep, and in response to the question, "Did you hear anything else unusual that night, after that," she testified, "Yes, after a while I heard him say, 'Get out of my bed  *  *  *'" with the addition of an obscenity. Later, on direct examination she testified that she heard the defendant tell "him to get off his bed," the inference being that the defendant told this to the deceased, but the witness was in no position to observe to whom the defendant was speaking. She testified that after she saw the defendant leave her apartment, "he came back in his own apartment," but since she remained in her bed she had no opportunity to observe where the defendant went after he left her room. She testified that the defendant left her room with the metal bar, that she then heard him say, "Get out of my bed  *  *  *," and following that he came back into her room and threw the metal bar on her bed. But a few questions later she was asked what happened after she heard the defendant say, "Get out of my bed  *  *  *," and her answer was:

> "I don't know, he went back outside, I guess because after awhile, he came back in and the police was there and he came in."

When asked if she was awakened by the metal bar she answered, "Yes, he dropped it on the floor." But she had previously testified that the defen-

dant threw the metal bar on her bed and she also testified that he threw the metal bar by her bed. She had no idea of how much time elapsed between the defendant's various entries into her room. Her testimony with respect to how the metal bar was taken out of her room a second time was complete speculation, but the jury heard it. The testimony was as follows:

"Question: The defendant threw the iron down by your bed.
Answer: Yes.
Question: After he threw it down by your bed, did you do anything with the iron?
Answer: I didn't touch it, he came back and got it.
Question: When did the defendant come back the third time?
Answer: He must have.
Question: Did you see him come back?
Answer: No, I was asleep.
Question: You mean, after he threw the iron back on your bed, you went back to sleep?
Answer: Yes."

While internal inconsistencies such as these in a witness' testimony are ordinarily matters to be resolved by the trier of fact (*People v. Smith* (1968), 102 Ill.App.2d 134, 243 N.E.2d 286; *City of Chicago v. Carney* (1962), 34 Ill.App.2d 303, 180 N.E.2d 729), the inconsistencies here emphasize the care which must be taken before using preliminary-hearing testimony when the witness is unavailable and the trier of fact cannot observe the witness' demeanor. The confusion in Ms. Watson's testimony together with the suspicions about the accuracy of her testimony and the factual gaps in the evidence lead me to the conclusion that the use of her testimony was an abuse of discretion which deprived the defendant of both his confrontation and due process rights.

One of the police officers and a former Assistant State's Attorney testified that the defendant confessed to the crime. Defendant denied making either a confession or an admission of guilt. It is impossible to evaluate how the jury would have resolved this conflicting testimony had it been free of the influence of Ms. Watson's testimony. I would, therefore, remand the case for a new trial at which the preliminary-hearing testimony would not be admitted.