THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MANFORD CLARK, Defendant-Appellant.

First District (5th Division)   No. 78-1372

Opinion filed December 14, 1979.

James J. Doherty, Public Defender, of Chicago (Robert Guch and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Linda Dale Woloshin, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial defendant was convicted of burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1) and was sentenced to serve a term of four years in the Department of Corrections. On appeal, he contends that (1) the trial court erred in admitting a witness' preliminary hearing testimony into evidence and (2) he was not proved guilty beyond a reasonable doubt.

Prior to commencement of the trial, the State presented a motion to allow the use at trial of testimony given by Louis Esmaili at the preliminary hearing. The following pertinent evidence was adduced at the hearing on the State's motion.

*Michael Spivack, Assistant State's Attorney of Cook County*

On December 1, 1977, he attempted to telephone the victim of a burglary occurring at 4628 North Central Park, Chicago, but was unsuccessful because the telephone was disconnected. He contacted directory assistance, but was told that there was no new listing for the victim. Pamela Eccarius, another witness in the case and a former neighbor of the victim, informed him that the victim's family sold the building and moved from 4628 North Central Park in September 1977. She did not know the present whereabouts of the victim.

He did not check county records to ascertain the owner of the

property involved. He was not aware of the relationship between Lee, Sonia and Elizabeth Esmaili nor was he aware of their places of employment.

Later that same day he gave an investigator from the State's Attorney's staff a copy of the police report, the victim's last known address, and the information he received from Pamela Eccarius and asked the investigator to locate Sonia, Elizabeth and Lee Esmaili. On December 12, 1977, the investigator "informed me that he could not locate the Esmaili family."

*Louis Leone, Assistant State's Attorney of Cook County*

On December 5, 1977, after reviewing the list of witnesses he learned that the victim was unavailable. The office file showed that assistant State's Attorney Spivack had asked the investigator to locate Lee, Sonia or Elizabeth Esmaili. After failing to reach the witnesses by telephone Leone checked the Chicago telephone book for listings for Louis, Elizabeth or Sonia Esmaili, but found a listing only for a George Esmaili. He also checked the Chicago phone book for names similar to Esmaili, thinking perhaps an error in spelling might have been made. He was still unable to locate the witnesses.

*James Jones—Deputy Cook County Sheriff*

He is an investigator assigned to the State's Attorney. On December 1, 1977, he received a written request from assistant State's Attorney Spivack to locate Lee, Sonia or Elizabeth Esmaili. He was given the police report to aid in his investigation. On December 13 he went to 4628 North Central Park, the address listed on the police report where he found "a two flat building with no names, nor bells or anything." He knocked on the door, but received no response. A woman on the first floor answered his knock when he returned there the next day, but she spoke no English.

From the police report he obtained the phone number of Pamela Eccarius, the missing witnesses' next door neighbor. During his phone conversation with her she informed him that "Elizabeth Esmaili and her family had moved in September of 1977 and left no forwarding address." She did not know of any relatives. Although she believed that Elizabeth had worked for Banker's Life on West Lawrence Avenue, she was not familiar with the employment of other members of the Esmaili family. Eccarius stated that a Korean family had moved into the second floor apartment. She felt that the Esmaili family still lived in the area, but she did not know exactly where.

Jones learned from the personnel department at Banker's Life that Elizabeth Esmaili worked there during August and September, 1977, but that she left no forwarding address or telephone numbers upon

termination. They did inform Jones that Elizabeth's father worked for a newspaper, but they did not know which paper or in what capacity.

He also inquired of the post office, but learned that Louis, Sonia and Elizabeth Esmaili did not leave forwarding addresses. He was also able to ascertain that none of them had been arrested, or held an Illinois driver's license or issued a traffic ticket. Telephone security informed him that the number listed for the Esmailis had been reassigned to another customer. The new holder of the number was unable to supply any information about the Esmaili family. Although he found two Esmaili names in the telephone directory, he was unable to obtain any information from these persons.

He was unable to find social security numbers, business phones or birth dates for the Esmaili family. He did no search for death certificates because he had no reason to believe that all four members of the Esmaili family might be dead, nor did he check voter's registration lists. His investigation lasted two or three days. In his opinion it would take another month to locate one of the witnesses.

*Fran Norek, Assistant State's Attorney of Cook County*

On December 5, 1977, she, Louis Leone and James Jones reviewed the file on Manford Clark whose case was approaching trial. They noticed that a request for investigation had been completed by Spivack. The names Lee, Sonia, Louis and Elizabeth Esmaili were contained in the file. Louis Esmaili, the son of the persons who rented the burglarized apartment, had testified at the preliminary hearing. She then gave Jones the police reports and the phone number of Pamela Eccarius and requested that he look for the Esmaili family. It was agreed that Jones spend his entire time on December 12, 13 and 14 in search of the missing witnesses.

Subsequently, she telephoned the personnel departments of the Chicago Tribune, Chicago Sun-Times and Lerner newspapers and learned that none of them had an employee named Esmaili. Pamela Eccarius informed her that Sonia Esmaili was the mother of Louis and Elizabeth Esmaili. Pamela did not know the father's name or occupation. Pamela further explained to her "that the Esmaili family was trying to avoid coming to court and did not want to testify or pursue this matter."

The following pertinent evidence was adduced at trial.

*For the State*

*Louis Esmaili—Preliminary Hearing Testimony*

On March 10, 1977, he resided at 4628 North Central Park in a second floor apartment rented by his parents. He believed the building was owned at the time by "the Philippino's." At 8 a.m. on March 10, 1977, he

left the apartment to go to school. His mother, stepfather and sister were still home when he left and the apartment was in a "neat condition." When he returned to the apartment at 2:30 p.m. that day the bedrooms were torn apart and "all the purses were emptied." Neither his parents nor his sister were present when he returned home.

On cross-examination he stated that his mother and stepfather rented the apartment and that he himself did not pay rent. He admitted that he did not know what time his parents and sister left the apartment on the morning in question. He could not say whether any family member was in the apartment at 10:30 a.m. on March 10, 1977.

On redirect he stated that the defendant, Manford Clark, was not present in the apartment when he left for school that morning.

*Pamela Eccarius*

On March 10, 1977, she resided on the first floor of 4630 North Central Park. The Esmaili family resided next door on the second floor at 4628 North Central Park. At about 10:30 a.m. on that date she was looking out her bedroom window toward the alley when she saw a man trying to open the alley gate at the Esmaili residence. She identified this man as defendant and stated that at the time he was wearing a short, lightweight, dark blue jacket. Defendant appeared to be having difficulty opening the gate. She watched him for a few minutes and then "went on about my housework and went in the kitchen." While she was in her kitchen she saw defendant walk from the alley to the front through the gangway between her home and 4632 North Central Park. She was able to observe his face. She returned to a rear window facing the rear doorway to the Esmailis' second floor apartment and waited a few minutes. The distance between her home and the Esmailis was approximately 15 feet. Subsequently she saw defendant leaving the Esmailis' apartment through the rear door. Defendant faced her and proceeded to descend the stairs to the first floor. She observed that he had "something under his arm" and was taking a dog out of the house on a leash. She described the dog as a very expensive, full-grown Alaskan Malamute. When defendant reached the first floor Eccarius "realized he was stealing the dog." After calling the police she returned to the window, but defendant was gone. She did not see where he went.

The police arrived in less than five minutes and she gave them a description of the man she had seen. About 10 minutes later the police brought defendant to the front of her house and placed him in a police car. She recognized defendant and told one of the officers that they had apprehended the right man.

On cross-examination she stated that she had never seen defendant prior to March 10, 1977. She admitted that she did not actually see defendant enter the Esmailis' apartment.

*Officer Wallace—Chicago Police Department*

At approximately 10:30 a.m. on March 10, 1977, he received an assignment to investigate a burglary in progress at 4628 North Central Park, second floor rear. Arriving at that address, he went through the gangway and observed a male running from the backyard to the alley. Although only able to see the man's back, he could see that the man was wearing a dark jacket and had light hair. His partner pursued the man westbound through the alleys, while he spoke with Pamela Eccarius. She gave him a description of the man which he relayed over the police radio. He then proceeded to check the allegedly burglarized apartment. He entered the open back door and found the bedroom "ransacked." The drawers were open, empty purses were on the floor, and a piggy bank was on one of the beds.

*Investigator Abbot, Chicago Police Department*

He also responded to the call announcing a burglary in progress at 4628 North Central Park. As he approached the location of the burglary he received a further broadcast stating that a subject, described as a white male in his mid-twenties and wearing a dark colored jacket, was running down the alley.

When he saw other police officers a few blocks from the scene, he left his car. As he ran through a gangway, he saw a man fitting the description he had received and proceeded to take this man into custody. He identified this man as defendant. Defendant stated that he had just been chasing a friend who was in an orange vehicle.

He took defendant to the scene of the burglary where a witness stated that defendant "was the subject she had seen leaving the house." Next he inspected the second floor apartment and found the bedroom in a state of disarray. The dresser drawers were open and various articles were strewn on the bed and floor. An empty piggy bank with the cover removed was lying on the bed.

*Walter Glocke, Chicago Police Officer*

He responded to the burglary in progress call along with his partner, Officer Wallace. As he entered the gangway at the scene he "observed a male, white, medium build, going through the gangway toward the alley." He identified this man as defendant. He pursued defendant westbound through the gangway. Defendant crossed the street, ran through another gangway, crossed a second street and ran into another gangway. As defendant reached the next alley more police officers arrived and joined the chase. Glocke and the other officers pursued defendant through another gangway and apprehended him in a playground on Lawndale Avenue. Defendant was carrying a dark blue coat under his arm.

The other officers placed defendant in a car and returned to the scene

of the burglary. Glocke walked back, following the route he had pursued defendant. In the backyard of 4628 North Central Park he found a plastic bag containing numerous pennies.

On cross-examination he stated that at the time of the arrest defendant said he was waiting for a friend who was just driving away in a van. Glocke admitted that he did see a van "pulling away" but could not recall the van's color.

## For the Defendant
### Wilhelmina Clark

She is defendant's sister and resides at 4603 N. Monticello St. with her mother and nephew. Her grandmother, aunt and cousin, Tyrone Hutton, reside at 4633 N. Monticello St. Monticello is one block west of Central Park and the two streets share a common alley. She stated that she knew the Esmaili family who lived on the second floor of a building at 4628 North Central Park, which was across the alley and to the south of her grandmother's house.

At approximately 8:30 or 9 on the morning of March 10, 1977, she met defendant at her grandmother's house. He was sitting at the kitchen table drinking coffee. Her mother, grandmother, sister and Tyrone Hutton were also present. At about 10 a.m. she asked defendant to accompany her to the store. As she and defendant started walking north on Monticello to Lawrence Avenue, she saw an orange van driven by Andrew Lopez proceeding westbound on Wilson Avenue which was one half block south. When she told defendant "there goes Andy," he ran westbound through a gangway across the street from their grandmother's home. Defendant was attempting to catch Lopez "over by the park" west of Monticello. She returned to her grandmother's home and approximately 15 or 20 minutes later learned that defendant had been arrested.

At no time during the morning of March 10, 1977, did she see defendant enter the yard or apartment at 4628 North Central Park. Defendant did not leave his grandmother's house or yard from 8:30 a.m. until they left for the store at approximately 10 a.m.

On cross-examination she stated that Andrew Lopez had previously said he would pick defendant up at home between 9:30 a.m. and 9:45 a.m. on March 10, 1977. Lopez and defendant were going to fix a toilet in a tavern.

### Andrew Lopez

On March 9, 1977, he told defendant he would pick defendant up at home the next morning so that they could "fix the washroom" at his father's tavern. Defendant's house was at the corner of Monticello and Wilson Avenues. He arrived there at approximately 10 a.m. on March 10,

1977, parked his orange van on Wilson and sounded the horn. When defendant did not come out, he went to the house and knocked. No one answered so he drove away.

*Bernice Baker*

She is defendant's mother and resides at 4603 N. Monticello. At approximately 7 a.m. on March 10, 1977, she went to her mother's home at 4633 N. Monticello. At approximately 8:30 a.m. her daughter Wilhelmina and defendant arrived. Her nephew Tyrone Hutton was raking leaves in the backyard. Defendant remained in the house for a while and then went out in the yard with Tyrone. She next saw defendant at the police station later in the day. She did not actually see the police arrest defendant.

*Michael Smith, Investigator, Public Defender of Cook County*

During the course of trial he visited 4628 and 4630 North Central Park. As he stood under the rear-most first floor window on the south side of 4630 North Central Park he was unable to see the rear door of the second floor of 4628 North Central Park.

*Manford Clark, on his own behalf*

At 8:30 a.m. on March 10, 1977, he and his sister Wilhelmina arrived at their grandmother's home at 4633 N. Monticello and sat in the kitchen. His grandmother, mother, another sister and Tyrone Hutton were there. After talking with his mother and grandmother he went outside to help Tyrone clean the backyard, remaining in the backyard for approximately 20 minutes. Wilhelmina came outside and asked him to accompany her to a store. He and Wilhelmina "started walking towards the front" and Tyrone went inside. As he was standing in front of his grandmother's house on Monticello he observed Andy Lopez "starting to pull off" from the corner of Monticello and Wilson Avenue in an orange van. Lopez was supposed to pick him up at 10 that morning so that they could fix a toilet at a tavern owned by Lopez's father. Defendant whistled but Lopez continued to pull away. He told his sister, "I ain't going," and ran westbound "right through the gangway through the park." He was not able to catch Lopez because he was stopped by police officers who told him he was wanted for burglary. He told the officers he was chasing his friend in an orange van. The officers placed him in a car, drove to a house on Central Park directly across the alley from his grandmother's house and took him out of the car. A woman from 4630 North Central Park came out, but he did not recall whether she said, "That's the man I saw." He had seen this woman before but did not know her name. He was not in the second floor apartment at 4628 North Central Park on March 10, 1977, nor did he take a dog or a bag of coins from that apartment.

On cross-examination he stated that he and his sister left at approximately 10 a.m. to walk to a store approximately six blocks away.

He admitted that this was the same time at which he was to meet Andrew Lopez. He assumed Lopez would wait for him until he returned from the store.

### Tyrone Hutton

He is defendant's cousin and resides in a first-floor apartment at 4633 N. Monticello. At approximately 9:30 a.m. on March 10, 1977, he saw defendant in their grandmother's apartment at the same address. Defendant came out to the backyard to help him rake leaves. When Wilhelmina asked defendant to go to the store with her, defendant and Wilhelmina left and he returned to his apartment. From his window he saw defendant and Wilhelmina cross Monticello on their way to the store. He did not see defendant cross the alley or enter any lots or houses on North Central Park. Nor did he see defendant with a bag or box containing coins.

He stated that he knew the family living on the second floor of 4628 North Central Park. The son, Lionel, was about 20 years old. The family had a large, black and grey Malamute Husky.

*For the State—Rebuttal*

A certified copy of defendant's November 5, 1975, conviction following a plea of guilty to burglary was offered in evidence by the State and received by the court.

OPINION

Defendant first contends that the trial court erred in admitting Louis Esmaili's preliminary hearing testimony at trial. He argues that the State failed to establish reasonable diligence in attempting to locate Esmaili. ██ It is clear that testimony given by a witness at a preliminary hearing may be admitted into evidence at trial "if the testifying witness is either dead or otherwise unavailable despite a good-faith effort by the State to produce him." (*People v. Brown* (1977), 47 Ill. App. 3d 616, 620-21, 365 N.E.2d 15, 18.) The effort to locate a missing witness must be directed by the State's Attorney. (*People v. Payne* (1975), 30 Ill. App. 3d 624, 332 N.E.2d 745.) A determination of whether or not that effort was made in good faith and with reasonable diligence must be made on a case-by-case basis after a careful review of the facts and circumstances of each particular case. *People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792, *cert. denied* (1973), 411 U.S. 937, 36 L. Ed. 2d 399, 93 S. Ct. 1917.

From a careful review of the testimony adduced at the hearing on the motion to admit Louis Esmaili's testimony, it is evident that the State's Attorney's office directed a thorough and systematic search for Louis Esmaili as well as for the other members of the Esmaili family. Three assistant State's Attorneys who were assigned to this prosecution and their

investigator each participated in the effort to locate the Esmaili family. Assistant State's Attorney Michael Spivack initially discovered on December 1, 1977, that the Esmailis might be unavailable and immediately requested assistance in locating them from the office investigator. He supplied the investigator with a copy of the police report. Assistant State's Attorneys Fran Norek and Louis Leone, who were also assigned to the case, met with the investigator, James Jones, on December 5, 1977, to review the file. The names of Louis, Lee, Sonia and Elizabeth Esmaili were contained in the file as well as the preliminary hearing testimony of Louis. It was agreed that Jones should spend his entire time on December 12, 13 and 14 on the matter. He was given the police report and the phone number of Pamela Eccarius, a next-door neighbor of the Esmaili family and an eyewitness to the burglary. Jones spent two or three full days searching for the Esmailis. The investigator spoke with the present occupants of the building at 4628 N. Central Park and with Eccarius, but was unable to ascertain the present location of the Esmaili family. He contacted the last known employer of Elizabeth Esmaili, but learned that she was no longer employed there. He was unable to obtain forwarding addresses for Louis, Lee, Sonia or Elizabeth Esmaili from the post office. He did, however, learn that none of them had ever possessed an Illinois driver's license or received a traffic ticket. He found two Esmailis listed in the telephone directory, but was unable to obtain any useful information from these numbers.

Norek and Leone also participated in the search. After Jones informed her that the father worked for a newspaper, Norek contacted the Sun-Times, Tribune and Lerner papers. None of the papers employed a person named Esmaili. Norek also spoke with Pamela Eccarius and learned "that the Esmaili family was trying to avoid coming to court and did not want to testify." Leone checked the telephone directory for the name Esmaili and for names with similar spelling, but obtained no helpful information.

■■ We believe the facts here indicate that the State's Attorney's office acted with good faith and diligence in conducting a coordinated and systematic search for the Esmaili family. The assistant State's Attorneys and the investigator worked together in the effort. The search was thorough rather than perfunctory. We do not believe that admission of the preliminary testimony here would encourage laxity on the part of those conducting future searches for missing witnesses.

*People v. Holman* (1924), 313 Ill. 33, 144 N.E. 313, upon which defendant relies in support of his argument that the search here was less than diligent, is clearly distinguishable from this case. In *Holman* defendant wrote three letters to an exculpatory witness who had testified at defendant's first trial. The last of these letters was sent approximately

three months prior to commencement of the second trial. The court held that defendant had failed to establish due diligence so as to permit admission of the earlier testimony. The efforts of defendant in *Holman* are simply not comparable to the thorough search conducted by the assistant State's Attorneys and the investigator in this case.

Defendant argues, however, that investigator Jones was told to locate Lee, Sonia or Elizabeth Esmaili rather than Louis Esmaili. However, the record does indicate that Jones also knew of, and was searching for, Louis Esmaili. Jones did review the file along with Norek and Leone. Norek testified that the names of all four Esmailis were contained in the file as was the preliminary hearing testimony of Louis. Additionally, Jones stated that he checked with the post office to determine whether Louis Esmaili left a forwarding address thus indicating that Louis was a target of his search. Moreover, it is reasonable to assume that any information concerning Louis' immediate family would have been helpful in locating Louis himself. (See *People v. Payne* (1975), 30 Ill. App. 3d 624, 332 N.E.2d 745.) This is especially true where, as here, the witness is of a youthful age and likely to reside with members of his immediate family.

■■■■ Defendant next contends that he was not proved guilty beyond a reasonable doubt. In support of this contention he first argues that the evidence did not establish that he lacked authority to enter the Esmailis' apartment. It is clear that in a prosecution for burglary the unauthorized nature of an entry may be established by circumstantial evidence. (*People v. Flowers* (1977), 52 Ill. App. 3d 301, 367 N.E.2d 453.) Flight from the scene of the crime is a form of circumstantial evidence which is based upon an inference that such flight bears a reasonable relation to a consciousness of guilt. (*People v. Cokley* (1977), 45 Ill. App. 3d 888, 360 N.E.2d 545.) Evidence of an accused's flight from the scene may, therefore, be considered with other evidence tending to prove guilt. *People v. Watson* (1975), 28 Ill. App. 3d 786, 329 N.E.2d 512.

■■ The record before us contains sufficient circumstantial evidence to support the trial court's finding that defendant's entry into the second floor apartment at 4628 North Central Park was unauthorized. Pamela Eccarius testified that she observed defendant attempting to enter the yard at the said address through an alley gate. When defendant was unsuccessful he proceeded through another gangway. She observed defendant exiting the second floor apartment a short time later with a bundle under his arm and the Esmailis' dog on a leash. When the police subsequently brought defendant to the scene, she recognized him as the man she had earlier seen attempting to enter through the alley gate and then leaving the Esmailis' apartment. Responding to Eccarius' call, Officer Glocke observed defendant running from the scene through a gangway. When defendant was apprehended a few blocks away he

claimed that he was chasing a friend. Returning to the scene of the burglary along the path he had chased defendant, Officer Glocke found a plastic bag full of pennies in the backyard of the burglarized premises. The police officers examined the Esmailis' apartment and found it to be in a state of general disarray. The dresser drawers were pulled out, purses were emptied and an empty piggy bank was lying on the bed. Defendant's efforts to enter the backyard of the premises through an alley gate, his departure from the Esmaili's apartment through the back door with their dog and a bundle and his subsequent flight from the scene are sufficient to establish the unauthorized nature of his entry.

■■ Although defendant contends that he never entered the apartment and that he was chasing a friend rather than fleeing, it is clear that in a bench trial the trial court must determine the credibility of witnesses and the weight to be accorded their testimony. (*People v. West* (1958), 15 Ill. 2d 171, 154 N.E.2d 286; *People v. Cokley* (1977), 45 Ill. App. 3d 888, 360 N.E.2d 545.) We find no basis in the record before us for substituting our judgment for that of the trial court.

In further support of his reasonable doubt contention, defendant argues that the evidence failed to establish that Sonia Esmaili owned, or was entitled to possession of, the allegedly burglarized apartment.

In *People v. Gregory* (1974), 59 Ill. 2d 111, 319 N.E.2d 483, our supreme court held that an indictment for burglary which did not allege ownership or possession of the burglarized premises was, nevertheless, sufficient. The court held that the indictment was sufficient to enable defendant to prepare a defense and to protect defendant from a subsequent prosecution for the same offense. The decision in *Gregory* has been held to be applicable where the proof adduced at trial fails to establish ownership or possession of the burglarized premises. (*People v. Hagen* (1978), 63 Ill. App. 3d 944, 380 N.E.2d 954; *People v. Flowers* (1977), 52 Ill. App. 3d 301, 367 N.E.2d 453.) In *Flowers* the court stated that:

> "Although the court's opinion in *Gregory* dealt with the sufficiency of criminal pleadings, rather than of proof, we believe that it has equal application to the instant case. It is therefore unnecessary for the State to prove the identity of the owner or possessor of the burglarized premises, provided the proof otherwise establishes that the entry was unauthorized, and the pleadings and proof are sufficiently specific to enable the defendant to present a defense, if he has one, and to protect the defendant from a second prosecution for the same offense." 52 Ill. App. 3d 301, 304, 367 N.E.2d 453, 455.

■■ As we have discussed above, the proof in the instant case was certainly sufficient to establish beyond a reasonable doubt that defendant's

entry into the premises was without authority. Moreover, defendant was fully apprised of the State's theory of the case and, therefore, suffered no disadvantage in the preparation of his defense. There was no question as to the time and place of the alleged burglary. Finally, defendant need have no fear of a second prosecution for the same burglary. The entire record in the trial court, as well as this opinion, will effectively bar any further prosecution for the burglary of the second floor apartment at 4628 North Central Park on March 10, 1977. Defendant's argument is therefore without merit.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.